MAST INDUSTRIES, INC. and Country Miss, Inc., Plaintiffs,

v.

Donald T. REGAN, Secretary of the Treasury, William Von Raab, Commissioner of Customs, the United States Treasury Department, the United States Customs Service and the United States, Defendants,

and

American Fiber/Textile/Apparel Coalition, Defendant-Intervenor.

RETAIL INDUSTRY TRADE ACTION COALITION, et al., Plaintiffs,

v.

UNITED STATES CUSTOMS SERVICE, et al., Defendants,

and

American Fiber/Textile/Apparel Coalition, Defendant-Intervenor.

LAURA ASHLEY, INC., Liz Claiborne, Inc., Marisa Christina Holdings, Inc., U.S. Shoe Corp., Plaintiffs,

v.

Donald T. REGAN, Secretary of the Treasury, William Von Raab, Commissioner of Customs, the United States Treasury Department, the United States Customs Service and the United States, Defendants,

and

American Fiber/Textile/Apparel Coalition, Defendant-Intervenor.

No. 84–8–01129.

United States Court of International Trade.

Oct. 4, 1984.

Mandel & Grunfeld, New York City (James Resti and Robert B. Silverman), New York City, for plaintiffs in Mast Industries, Inc. et al. v. Regan, et al.

Weil, Gotshal & Manges, New York City (Stuart M. Rosen, Richard Davis, and Jeffrey Bialos), Washington, D.C., for the plaintiffs in Retail Industry Trade Action Coalition, et al. v. United States Customs Service, et al.

Siegel, Mandell & Davidson, P.C., New York City (Allan H. Kamnitz and Anthony Y. Cheh), New York City, for plaintiffs in Laura Ashley, Inc. et al. v. Regan, et al.

Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Washington, D.C., (Kevin C. Kennedy) Washington, D.C., for defendants in Mast, Retail Industry Trade Action Coalition and Laura Ashley N/A.

Miller & Chevalier, Washington, D.C. (Donald Harrison, James P. Tuite, and Kenneth B. Reisenfeld) Washington, D.C., for defendant-intervenors in Mast, Retail Industry Trade Action Coalition and N/A Laura Ashley.

DiCARLO, Judge:

Plaintiffs, importers and retailers of textile products, are challenging interim regulations amending requirements for importing textiles and textile products that are subject to quantitative limitations under bilateral trade agreements or pursuant to unilaterally imposed restraints. These actions, consolidated September 28, 1984, raise questions about the authority delegated to the President under Section 204 of the Agricultural Act of 1956, as amended, 7 U.S.C. § 1854 (1982), (Section 204) and the application of the rulemaking procedures set forth in the Administrative Procedure Act, 5 U.S.C. §§ 551–706 (1982) (APA), to the President's exercise of this authority.

The complaint in *Mast Industries, Inc. v. Regan, et al.*, No. 84–8–01129 (*Mast*) was filed August 9, 1984. *Mast* filed their motion for summary judgment August 20, 1984. Defendants answered and cross-moved for summary judgment August 24, 1984.

*Retail Industry Trade Action Coalition, et al. v. United States Customs Service, et al. (RITAC)* was filed August 29, 1984. On August 30, 1984, the Court granted *RITAC's* motion for an order to show cause why a preliminary injunction should not issue to enjoin implementation of the interim regulations. On September 11, 1984, the defendants moved for an order treating *RITAC's* motion for a preliminary injunction as a motion for summary judgment, and the defendants' opposition as a cross-motion for summary judgment or to dismiss. *RITAC* moved for summary judgment September 21, 1984. On September 21, 1984, defendants cross-moved for summary judgment or dismissal.

Oral argument was heard September 6, 1984, on the *Mast* motion for summary judgment and the *RITAC* motion for a preliminary injunction.

*Laura Ashley, Inc., et al., v. Regan, et al., (Laura Ashley)* was filed August 29, 1984. *Laura Ashley* moved for summary judgment September 13. Defendants cross-moved for summary judgment September 20.

Defendant-Intervenor, American Fiber/Textile/Apparel Coalition, an association of domestic textile manufacturers and labor unions, was granted leave to intervene in these cases September 20, 1984, and filed its brief September 24, 1984. Plaintiffs responded September 27, 1984.

In ruling on cross-motions for summary judgment, the Court must first determine whether genuine issues of material fact exist. If there are none, it must then decide whether either party is entitled to judgment as a matter of law. *American Motorist Insurance Co. v. United States*, 5 CIT ——, Slip Op. 83–8, at 4 (February 1, 1983); *Carson M. Simon & Co. v. United States*, 3 CIT 4, 5 (1982); *see United States v. United States Gypsum Co.*, 340 U.S. 76, 86–88, 71 S.Ct. 160, 168–169, 95 L.Ed. 89 (1950) (Sherman Act violation ripe for decision on summary judgment in nonjury case).

Pursuant to Rule 56(i) of the Rules of this Court, the parties in *Mast* and *Laura Ashley* provided the Court with joint statements of material facts that are not in dispute. The parties agree that the pleadings, briefs, affidavits and all other papers filed in these actions "show that there is no genuine issue as to any material fact" under Rule 56(d), and that the actions are ripe for summary judgment. *RITAC* maintains that there are unresolved factual issues precluding summary judgment for the defendants on *RITAC's* third, fourth and sixth causes of action. For reasons stated in relevant parts of its opinion, the Court disagrees.

## I. Background

On August 3, 1984, Customs published in the *Federal Register*, 49 Fed.Reg. 31,248–54 (1984), a notice promulgating interim regulations containing new rules and documentation requirements by which Customs would enforce visa and export license, country of origin, documentation, and other requirements and restrictions applicable exclusively to importations of textile products.[1] The notice stated that the interim regulations were exempt from the rulemaking requirements of the APA as involving "a foreign affairs function of the U.S.," and that written comments received on or before October 2, 1984, would be considered before adoption of final rules. *See* 5 U.S.C. § 553(a)(1), (b)–(c).

The interim regulations became effective September 7, 1984 for textile products exported from their "country or origin," as therein defined. On August 23, 1984, Customs announced that the interim regulations would not be enforced against textile products contracted before August 3, 1984, and exported to the United States on or before October 31, 1984. For other exports, the interim regulations remained effective as of September 7, 1984. This announcement was published in the *Federal Register* on August 29, 1984. *See* 49 Fed. Reg. 34,199 (1984).

Customs in issuing the interim regulations relied on Section 204 which allows the President to make agreements with foreign governments limiting their textile exports to the United States, and to issue regulations implementing these agreements.[2]

The notice of August 3rd stated that the "future administration of these agreements was severely jeopardized" by the decision

---

1. The Committee for the Implementation of Textile Agreements (CITA), directed that the interim regulations be issued. CITA is composed of representatives of the Departments of Commerce, Treasury, State and Labor, and the United States Trade Representative, and is authorized to supervise and implement textile agreements within the delegation from Congress under Section 204. Executive Order 12,475, published in the *Federal Register* May 11, 1984, 49 Fed.Reg. 19,955, directed the Treasury Department to promulgate the regulations "[i]n accordance with policy guidance provided by [CITA]." *Id.* CITA provided this "policy guidance" in a letter to John M. Walker, Jr., Asst. Secretary, Department of Treasury, from Walter C. Lenahan, Chairman of CITA, dated July 27, 1984, and attached as Exhibit J of Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment in *Mast*.

2. Pursuant to Section 204, the United States has entered into the Arrangement Regarding International Trade in Textiles, the Multifiber Agreement, (MFA), a multilateral agreement establishing standards for regulating imports.

The MFA provides a basis on which textile importing nations, as the United States, may negotiate agreements with an exporting nation limiting textile imports or, if necessary, unilaterally imposing import restraints. Each bilateral sets an aggregate limitation on total textiles and textile product exports to the United States from the particular country as well as limitations for groups of products or specific categories of "sensitive" products.

in *Cardinal Glove Co. v. United States*, 4 CIT 41 (1982), which found the U.S.–Hong Kong bilateral agreement applicable only to those textile products having Hong Kong as their "country of exportation." The Court found glove panels manufactured in Hong Kong "substantially transformed" when sewn together into finished gloves in Haiti, and, therefore, "exported" from the latter country for quota and export licensing purposes. *See id.* at 45 & n. 4

The defendants contend in their briefs and affidavits that the interim regulations are necessary to prevent increasing circumvention of existing quota limitations by importers under the "country of origin" rule stated in *Cardinal Glove*. The defendants cite

> the recurring situation where, for example, country A would export its nearly-completed textile products to country B, where the product would undergo an insubstantial sewing or packaging process. From there, the product would be imported into the United States under country B's quota for that product. In this way, country A, whose quota for that textile product had been filled, would seek to gain entry of its textile products into the United States in circumvention of the MFA and its bilateral textile agreement with the United States.[3]

As a result of "circumvention" of the MFA and the bilaterals, the defendants state that textile imports increased 25 percent in 1983 and 41 percent in the first half of 1984. Imports of textile products in the 12 months ending in June, 1984, total 8.7 billion square yards equivalent (SYE), up from 3.8 billion SYE in 1975 and 4.9 billion SYE in 1980, with resulting ill effect on the U.S. domestic textile industry.[4]

Plaintiffs do not contest that textile imports into the United States have rapidly increased, but deny circumvention of the MFA or the bilaterals. They assert that the meaning of "substantial transformation" for purposes of "country of origin" determination is well established and that they have arranged their multinational manufacturing and processing operations in reliance on this standard. They contend that the interim regulations will create shortages and financial loss as textile products previously eligible for importation will now be subject to quota restrictions imposed upon their "new" country of origin. Plaintiffs estimate "the adverse affect [of the interim regulations] could be as high as $1.6 billion or more at retail" and assert that the government of Hong Kong alone has estimated that $700 to $800 million of its annual apparel trade with the United States will be affected.[5]

Under interim regulation § 12.130(a), the visa or export license needed for textiles imported into the United States must be issued by the government of the "country of origin," regardless of whether the goods were exported from that country to the United States. It determines the "country of origin" for textiles which consist, in whole or in part, of materials which originated, or were processed in, another foreign country.[6] In order to determine coun-

---

3. Defendants' Opposition to Plaintiffs' Motion for Summary Judgment in *Mast*, at 14.

4. Affidavit of Walter C. Lenahan, Deputy Assistant Secretary for Textiles and Apparel, International Trade Administration, U.S. Department of Commerce and Chairman of CITA, at 4, 5.

5. Letter from J. Robert Brouse, Managing Director, Retail Trade Action Coalition, to John W. Walker, Jr., Assistant Secretary of the Treasury, Attachment at 2, (August 17, 1984), Exhibit 2 to Plaintiffs' Order to Show Cause in *RITAC*.

6. Under the interim regulations, a country will not be recognized as the "country of origin" of a textile article unless that article is subjected to a "substantial manufacturing or processing operation" which "substantially transform[s]" the article into a new and different article of commerce. Interim regulation § 12.130(b)(1) specifically precludes several manufacturing/processing operations from being considered as effecting a "substantial transformation," including assembling apparel from fabric components, and finishing, treating, or dyeing fabric or apparel. Interim regulation § 12.130(b)(3) provides that Customs will determine whether a textile or textile product has been "substantially transformed" by applying several criteria, including change in commercial designation or identity, change in essential character, and change in commercial use. The regulations ap-

try of origin, interim regulation § 12.130(c) imposes documentation requirements and denies entry to textiles exported without the documents. Imports of textiles that are not wholly the growth, product, or manufacture of one country must be accompanied by a declaration including (a) the origin of all materials; (b) the nature of the manufacturing or processing operations performed on the materials and where these processes were performed; and, (c) the material and direct processing costs involved in each such operation. If Customs determines that the information contained in this declaration is incomplete or insufficient, Customs will detain the goods until the "best information available" is obtained. Interim regulation § 12.130(e).

Interim regulations §§ 18.11 and 6.18 permit the district director to require evidence of the value and quantity of textiles at the port of arrival before they may be entered for transportation in bond without appraisement.

Interim regulations §§ 144.38(f), 146.49, and 19.11(g) prohibit withdrawal from bonded warehouse, or transfer from a foreign trade zone, textiles or textile products subject to visa or export license requirements at the time of their importation if, during their time in the warehouse or foreign trade zone, they were changed, by manipulation or otherwise, so as to alter their country of origin (as defined in the interim regulations) or their textile quota category, or to exempt them from visa or export license requirements.

Interim regulation § 12.131 requires a formal entry and visa or export license for separate shipments of textiles and textile products designated for one consignee on the same conveyance on the same day, the combined value of which is over $250.00.

The *Mast* complaint contains five counts, the *RITAC* complaint six, and the *Laura Ashley* complaint three.

Count I in *Mast* and *Laura Ashley* and Counts I and II in *RITAC* allege that the defendants violated the Administrative Procedure Act in promulgating the interim regulations without providing for notice of the rulemaking and an opportunity for comment by the public.

Count II in *Mast* and *Laura Ashley* and Count III in *RITAC* allege that the Executive exceeded his congressionally delegated authority under Section 204.

Count III in *Mast* and Counts IV and V in *RITAC* allege that the interim regulations conflict with statutes and holdings of this Court and are, therefore, arbitrary, capricious, and unsupported by valid administrative purpose, and should be declared unlawful under 5 U.S.C. § 706(2)(A).

Count IV in *Mast* and Count III in *Laura Ashley* allege that in promulgating the interim regulations, Customs violated 19 C.F.R. § 177.10(c)(2) (1983) [7].

Count V in *Mast* alleges that Section 204 is an unconstitutional delegation of legislative power to the Executive by Congress.

Count VI in *RITAC* alleges that the interim regulations are retroactively effective and therefore violate Article 1, section

---

pear to contemplate that all of these criteria will be considered and applied in each instance.

**7.** Section 177.10(c)(2) of the Customs Regulations provides that before publication of "a ruling which has the effect of changing a position of the Customs Service and which results in a restriction or prohibition, notice must be published in the *Federal Register* and an opportunity for interested parties to comment must be provided." Plaintiffs contend no such notice or opportunity to comment was afforded and the interim regulations thus violate § 177.10(c)(2), rendering the interim regulations null, void and without legal effect.

The regulations are issued pursuant to an Executive Order. Customs is acting at the direction of the President. Under these circumstances, it is the opinion of the Court that section 177(c)(2) does not obligate Customs, acting under Executive Order, to follow more stringent notice and comment procedures than contained in the APA.

Whatever procedural defects, if any, there are in the interim regulations with respect to Section 177.10(c)(2), they constitute, at most, harmless error. *See Timken Co. v. Regan,* 4 CIT 174, 179, 552 F.Supp. 47, 52 (1982).

10, clause 1 of the United States Constitution.

The defendants argue that the actions should be dismissed for lack of jurisdiction, failure to exhaust administrative remedies, lack of standing, nonjusticiability, and failure to state a claim upon which relief may be granted.

Part II of this opinion considers the defendants' claim that the Court does not have jurisdiction and the plaintiffs lack standing; Part III discusses the scope of Congress' delegation to the President of authority to implement international textile agreements and its constitutionality (*Mast* Counts II and V; *RITAC* Count III and VI[8]; *Laura Ashley* Count II); Part IV considers the relationship between these interim regulations and existing statutes and judicial precedent, and whether the interim regulations are arbitrary, capricious or unlawful under 5 U.S.C. § 706(2)(A) (*Mast* Count III; *RITAC* Counts IV and V); Part V discusses application of the notice and comment provisions of the APA and of 19 C.F.R. § 177.10(c)(2) (*Mast* Counts I,[9] and IV; *RITAC* Counts I and II; *Laura Ashley* Counts I, III).

## II. Jurisdiction and Standing

The defendants contend that the Court does not have subject matter jurisdiction under 28 U.S.C. § 1581(i)(3) and (4). The Court disagrees.

As a general rule, challenges to classification, valuation and entry of merchandise are reviewed pursuant to 28 U.S.C. § 1581(a) after the administrative remedies under 19 U.S.C. § 1514 and § 1515 have been exhausted. *United States v. Uniroyal, Inc.*, 69 CCPA 179, 182, 687 F.2d 467, 471 (1982) ("Congress did not intend the Court of International Trade to have jurisdiction over appeals concerning completed transactions when the appellant had failed to utilize an avenue for effective protest before the Customs Service").

A denied protest is not a condition precedent to the Court's exercise of jurisdiction. In *United States Cane Sugar Refiners' Association v. Block*, 69 CCPA 172, 683 F.2d 399 (1982), the plaintiff challenged a Presidential Proclamation imposing quotas on sugar imports. The Court of Customs and Patent Appeals held:

> We are persuaded that in this case, involving the potential for immediate injury and irreparable harm to an industry and a substantial impact on the national economy, the delay inherent in proceeding under § 1581(a) makes relief under that provision manifestly inadequate and, accordingly, the court has jurisdiction in this case under § 1581(i).

69 CCPA at 175 n. 5, 683 F.2d at 402 n. 5; *see also American Association of Exporter & Importers Textile & Apparel Group v. United States*, 7 CIT —, 583 F.Supp.

---

**8.** The *RITAC* plaintiffs, in their sixth cause of action, allege that the interim regulations are a retroactive impairment of contract in violation of the impairment of contracts clause, U.S. Const., Article I, section 10, implicating due process rights under the fifth amendment. The impairment of contracts clause has never been interpreted to apply to the federal government. *See Washington Star Co. v. International Typographical Union Pension Plan*, 729 F.2d 1502, 1507 (D.C.Cir.1984). Though the clause may have relevance in determining whether a "taking" of property has occurred for purposes of the fifth amendment, plaintiffs here lack a property interest. As the Supreme Court has stated:

> No one has a legal right to the maintenance of an existing rate or duty. Neither the action of Congress in fixing a new tariff nor that of the President in exercising his delegated power is subject to impeachment if the prescribed forms of legislation have been regularly observed.

*Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 318, 53 S.Ct. 350, 359, 77 L.Ed. 796 (1933); *see also S.J. Stile Assocs., Ltd. v. Snyder*, 68 CCPA 27, 30 n. 7, 646 F.2d 522, 523, 526 n. 7 (1981).

**9.** The *Mast* complaint in Count I also contends that the defendants failed to abide by the requirements of the Regulatory Flexibility Act, 5 U.S.C. §§ 603, 604 (1982), and Executive Order 12,291, 46 Fed.Reg. 13,193 (1981) in promulgating these rules. This issue was not briefed by plaintiffs and the Court notes simply that the compliance or noncompliance of agencies with the Regulatory Flexibility Act and Executive Order 12,291 is specifically precluded from judicial review. 5 U.S.C. § 611.

591, 593 & n. 9 (1984), *appeal docketed,* No. 84–1060 (Fed.Cir. April 13, 1984); *Associated Dry Goods Corp. v. United States,* 2 CIT 51, 55, 521 F.Supp. 473, 476 (1981), *modified,* 3 CIT 1, 533 F.Supp. 1343, *vacated as moot,* 69 CCPA 169, 682 F.2d 212 (1982).

In this case, the interim regulations will restrict imports and result in an embargo of textiles from nations whose quotas are full. Relief under § 1581(a) would be "manifestly inadequate" and the potential of "immediate injury and irreparable harm to an industry and a substantial impact on the national economy" is very real. The Court has jurisdiction in this action under § 1581(i).

The defendants also challenge the standing of these plaintiffs to bring these actions.

Plaintiffs import textile products. They have a direct interest in purchasing textile products and have entered into contractual relationships based upon the former regulations. The imposition of a new "country of origin" standard effectively acts as a quantitative restraint on the import of textiles and clearly injures the plaintiffs as "business relationships ... could be disrupted and adversely affected by the quotas." *United States Cane Sugar Refiners' Association v. Block,* 3 CIT 196 at 202, 544 F.Supp. 883 at 887. Accordingly, the Court holds that plaintiffs have standing in these actions.

The remaining plaintiffs are four trade associations that are members of *RITAC* and that are acting on behalf of their members. The members of the trade associations purchase and import into the United States textile products subject to the interim regulations. In *United States Cane Sugar Refiners' Association v. Block,* and *American Association of Exporters and Importers,* the courts ruled a plaintiff-trade association possessed standing pursuant to 28 U.S.C. § 2631(i). *United States Cane Sugar* was affirmed on this point by the Court of Customs and Patent Appeals and controls here. *See* 69 CCPA at 175 n.

5, 683 F.2d at 402 n. 5, *aff'g* 3 CIT 196, 544 F.Supp. 883 (1982).

## III. Delegation

The *Mast* plaintiffs contend Section 204 is an unconstitutional delegation of legislative authority to the President. The Court disagrees.

An act of Congress was last invalidated as unconstitutionally delegating legislative authority in 1935. *See A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 541–42, 55 S.Ct. 837, 848, 79 L.Ed. 1570 (1935); *Industrial Union Department, AFL–CIO v. American Petroleum Institute,* 448 U.S. 607, 717 n. 30, 100 S.Ct. 2844, 2902 n. 30, 65 L.Ed.2d 1010 (1980) (Marshall, J., dissenting).

"The plenary authority of Congress to regulate foreign commerce, and to delegate significant portions of this power to the Executive, is well established." *California Bankers Assn. v. Shultz,* 416 U.S. 21, 59, 94 S.Ct. 1494, 1516, 39 L.Ed.2d 812 (1974).

Statutes granting broad discretion to the President to implement trade agreements are common, and they often contain language similar to that in Section 204. *See, e.g.,* Section 201(a) of the Trade Expansion Act of 1962, 19 U.S.C. § 1821(a), discussed in *U.S. Cane Sugar Refiners' Association. See United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 322–24, 57 S.Ct. 216, 221–22, 81 L.Ed. 255 (1936); *Florsheim Shoe Co. v. United States,* 744 F.2d 787 at 793 (Fed.Cir.1984); L. Tribe *American Constitutional Law* § 4–2, at 158–63 (1978).

A constitutional delegation of powers requires that Congress state a policy or objective for the President to execute and also that it establish a standard or "intelligible principle" that makes clear when action is proper. *Star-Kist Foods, Inc. v. United States,* 47 CCPA 52, 60, 275 F.2d 472, 480 (1959). The congressional policy expressed in Section 204 is the limitation of imports of textiles and agricultural commodities into the United States. *See*

*American Association of Exporters & Importers,* 7 CIT at ——, 583 F.Supp. at 598.

■ Plaintiffs also contend that the interim regulations are ultra vires. Section 204 delegates to the President authority "to issue regulations ... to carry out ... agreement[s]." Plaintiffs maintain that the interim regulations issued by Customs violate the MFA and the bilaterals and therefore do not "carry out" agreements.

■ In the absence of a contrary legislative intent, statutory terms are to be construed according to their common meaning as a matter of law. *See C.J. Tower & Sons of Buffalo, Inc. v. United States,* 69 CCPA 128, 133, 673 F.2d 1268, 1271 (1982); *Toyota Motor Sales, U.S.A., Inc. v. United States,* 7 CIT ——, 585 F.Supp. 649, 653 (1984).

The common purpose of Section 204, the MFA and the bilaterals is to limit imports of textiles. *See American Association of Exporters and Importers,* 7 CIT at ——, 583 F.Supp. at 593; *Consumers Union of the United States, Inc. v. Committee for the Implementation of Textile Agreements,* No. 74–968 (D.D.C.1975), *rev'd on jurisdictional grounds per curiam,* 561 F.2d 872 (D.C.Cir.1977), *cert. denied,* 435 U.S. 933, 98 S.Ct. 1509, 55 L.Ed.2d 531 (1978). The Executive states that these interim regulations are essential to carry out that intent. Exec.Order No. 12,475, 49 Fed.Reg. 19,955 (1984).

■ "[C]ongressional authorizations of presidential power [in the foreign affairs area] should be given a broad construction and not 'hemmed in or "cabined, cribbed, confined" by anxious judicial blinders.'" *Florsheim Shoe Co. v. United States,* 744 F.2d 787 at 793 (Fed.Cir.1984) (quoting *South Puerto Rico Sugar Co. Trading Corp. v. United States,* 167 Ct.Cl. 236, 334 F.2d 622, 632 (1964), *cert. denied,* 379 U.S. 964, 85 S.Ct. 654, 13 L.Ed.2d 558 (1965)).

Where Congress has given the President discretion in delegating authority in international trade, the courts have uniformly sustained action taken by the Executive Branch against a claim that it has exceeded the delegated authority. *See, e.g., Federal Energy Administration v. Algonquin SNG, Inc.,* 426 U.S. 548, 561–62, 96 S.Ct. 2295, 2303, 49 L.Ed.2d 49 (1976); *U.S. Cane Sugar Refiners' Association v. Block,* 69 CCPA 172, 177–78, 683 F.2d 399, 404 (1982); *United States v. Yoshida International, Inc.,* 63 CCPA 15, 32–33, 526 F.2d 560, 580–81 (1975). *Cf. Luggage and Leather Goods Manufacturers of America, Inc. v. United States,* 7 CIT ——, slip op. 84–53, at 30 (May 11, 1984) (President not given discretion to grant duty-free treatment under the Generalized System of Preferences to textiles "subject to" the MFA and the bilaterals).

The Court holds that the term "to carry out" confers upon the President the authority to issue these interim regulations and further holds that the President acted within the scope of the authority constitutionally given him by Congress.[10]

## IV. The Administrative Procedure Act Review under 5 U.S.C. § 706(2)(A)

■ Plaintiffs in *Mast* and *RITAC* contend that the interim regulations regarding country of origin, documentation, in-bond transportation, and warehouse manipulation should be declared void under 5 U.S.C. § 706(2)(A), which states that a court shall

hold unlawful and set aside agency action, findings, and conclusions found to be—

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law ...

■ Plaintiffs argue that the record before the Court insufficiently discloses the factual and analytical basis for defendants' decision to promulgate the interim regulations. But where action is committed to executive discretion, judicial review is limit-

---

**10.** Because the Court holds as a matter of law that Section 204 delegates to the President authority to limit textile imports, facts showing that the interim regulations would result in different quotas than those negotiated by the President are inmaterial, and the third cause of action in *RITAC* is therefore ripe for summary judgment.

ed. As the Court of Appeals for the Federal Circuit recently stated:

[T]he Executive's decisions in the sphere of international trade are reviewable only to determine whether the President's action falls within his delegated authority, whether the statutory language has been properly construed, and whether the President's action conforms with the relevant procedural requirements. The President's findings of fact and the motivations for his action are not subject to review. *United States v. George S. Bush & Co.*, 310 U.S. 371, 379–80 [60 S.Ct. 944, 946, 84 L.Ed. 1259] (1940); *United States Cane Sugar Refiners' Association v. Block*, 683 F.2d 399, 404 (CCPA 1982); *Aimcee Wholesale Corp. v. United States*, 468 F.2d 202, 206 (CCPA 1972).

*Florsheim Shoe Co. v. United States*, 744 F.2d 787 at 795 (Fed.Cir.1984).

After it is decided that the President has congressional authority for his action, "his motives, his reasoning, his finding of facts requiring the action, and his judgment, are immune from judicial scrutiny." *United States Cane Sugar Refiners' Association v. Block*, 69 CCPA at 177, 683 F.2d at 404; *Florsheim Shoe Co.*, 744 F.2d 787 at 796.

The court of appeals in *Florsheim* interpreted Section 504 of Title V of the Trade Act of 1974, 19 U.S.C. § 2646 (1982). That statute gives the President authority to "withdraw, suspend, or limit" duty-free treatment accorded under the Generalized System of Preferences after consideration of a variety of factors.

The Court of Appeals found in this statute "an explicit grant to the President of plenary authority". *Florsheim*, at 793.

Section 204 is as broad in its grant to the President of authority to negotiate with other governments "whenever he determines such action appropriate" and "to issue regulations ... to carry out any such agreement." *See American Association of Exporters and Importers v. United States*, 7 CIT ——, 583 F.Supp. 591, 598 (1984) ("Section 204 grants extraordinary discretion to the President in negotiating textile trade agreements and regulating textile importation.")

Under *Florsheim*, the Court thus may consider only whether the President failed to "properly construe" his authority under Section 204; *i.e.*, whether the interim regulations were promulgated "not in accordance with law." [11]

■ The "law" for purposes of Section 706 review does not include the MFA or bilateral agreements. A case arises under an international agreement only if the agreement confers legal rights on the plaintiffs. Many agreements that ultimately benefit individual interests do not give them justiciable legal rights. *See, e.g., Dreyfus v. Von Finck*, 534 F.2d 24, 29–30 (2d Cir.), *cert. denied*, 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976). The Court knows of no language in the MFA or bilateral agreements that would show an intent to create private rights, *i.e.*, to make the agreements self-executing. Plaintiffs do not have a protected interest to argue that the country of origin regulations violate the terms of the MFA or the bilaterals, or are promulgated outside their framework.

Plaintiffs maintain that the country of origin rules, interim regulation § 12.130, are contrary to judicial precedent defining "substantial transformation" and in direct conflict with the court's holding in *Cardinal Glove Co. v. United States*, 4 CIT 41 (1982).

They further contend that the interim regulations contradict the holding in *Cardinal Glove* in at least two respects. First, the interim regulations provide that assembly of fabric components into a finished garment will not in itself constitute substantial transformation; and, secondly, the

---

**11.** The *RITAC* plaintiffs argue summary judgment cannot be granted against them on this issue, but insofar as the Court holds that *Florsheim* forbids it from considering the factual basis for the decision to promulgate the regulations, there is no material issue of fact for plaintiffs to discover.

interim regulations provide that the country of assembly is not to be the "country of origin" for quota or marking purposes. Plaintiffs maintain the decision in *Cardinal Glove* is contrary in both points.

■ Customs cannot disregard judicial precedent interpreting authority. *See FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 385, 85 S.Ct. 1035, 1042, 13 L.Ed.2d 904 (1965). In this case, however, Customs' authority is derived from the President's power to issue regulations to implement agreements negotiated with foreign countries. There is nothing in the *Cardinal Glove* case that prevents the President from implementing this authority under Section 204 by having Customs issue regulations. (*See* Part III, *supra*).

Plaintiffs [12] challenge two other interim regulations as contrary to statutes: the in-bond regulation, § 18.11, 49 Fed.Reg. 31,253, and the warehouse manipulation regulation, § 144.38, 49 Fed.Reg. 31,253-54.

Interim regulation § 18.11(e) [13] has recently been modified so that it would no longer require the production of a visa, export license or rated invoice at the port of arrival. These modifications, in the Court's view, moot plaintiffs' objections to the amendment originally embodied in interim regulation § 18.11(e).

Plaintiffs also contend that the amendment to § 144.38 which prohibits the manipulation of "textiles" in a bonded Customs warehouse conflicts with Section 562 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1562, and is therefore void.

Under interim regulation § 144.38(f), if manipulation changes (1) the country of origin; (2) the textile category; or, (3) the visa or export licensing requirements for the merchandise, it may not be withdrawn from a warehouse for consumption. Plaintiffs say precedent construes 19 U.S.C. § 1562 so that merchandise entered into a bonded warehouse is not "imported" and is not, therefore, subject to tariff regulations until withdrawn. *Marques Del Merito, Inc. v. United States*, 36 CCPA 38, 43-44, C.A.D. 394 (1948).

This does not mean, however, that 19 U.S.C. § 1562 [14] expressly permits the manipulations prohibited in interim regulation § 144.38(f).

In fact, Section 1562 generally *prohibits* all manipulation of merchandise in a bonded warehouse unless expressly permitted by Customs.

The Court finds that the interim regulations are "in accordance with law" under 5 U.S.C. § 706(2)(A).

## V. The Administrative Procedure Act Review under 5 U.S.C. § 553

Having decided that "the President's action falls within his delegated authority"

12. *See* Plaintiffs brief in support of summary judgment motion in *Mast*, at 43-53.

13. Plaintiffs' argument, submitted before interim regulation § 18.11(e) was modified, points out that requiring visas or export licenses to be included in the entry papers and authorizing the district director to require evidence of the values and quantities stated in the entries, would result in the delay of the delivery of goods transported in bond. 19 U.S.C. § 1552 facilitates the shipment of goods, other than explosive or prohibited goods, from the port of arrival to the port of destination with "utmost expedition." *United States v. Harris & Co.*, 4 Ct.Cust. Appls. 116, 119 (1931).

14. 19 U.S.C. § 1562 provides in pertinent part: Unless by special authority of the Secretary of the Treasury, no merchandise shall be withdrawn from bonded warehouse in less quantity than an entire bale, cask, box or other package; or, if in bulk, in the entire quantity imported or in a quantity not less than one ton weight. All merchandise so withdrawn shall be withdrawn in the original packages in which imported unless, upon the application of the importer, it appears to the appropriate customs officer that it is necessary to the safety or preservation of the merchandise to repack or transfer the same: *Provided, That upon permission therefor being granted by the Secretary of the Treasury, and under customs supervision*, at the expense of the proprietor, merchandise may be cleaned, sorted, repacked, or otherwise changed in condition, but not manufactured, in bonded warehouses established for that purpose and be withdrawn therefrom for exportation to a foreign country....
*Id.* (emphasis added).

and that "the statutory language has been properly construed" the Court must now determine whether "the President's action conforms with the relevant procedural requirements." *Florsheim*, at 795. The Court now considers plaintiffs' claim that the prior notice and comment provisions of the Administrative Procedure Act, 5 U.S.C. § 553, were not complied with and that Customs was not within any of the section's exceptions.

## A. Application

The notice of August 3 implicitly recognized the applicability of the APA.[15] But at oral argument the defendants suggested that the interim regulations were not "rule making" within the APA because they were promulgated by Treasury order at the direction of the President.[16]

"Rule making" is defined as "agency process for formulating, amending, or repealing a rule". 5 U.S.C. § 551(5). The APA defines "agency" for the purposes of Section 553 as follows:

"agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

(A) the Congress;
(B) the courts of the United States;
(C) the governments of the territories or possessions of the United States;
(D) the government of the District of Columbia.

5 U.S.C. § 551(1)(A)–(D)

Congress created no exception for action taken at the direction of the President.

Much that the federal government does, and much of its important action, is at the direction of the President, as Chief Executive. Application of the APA would be substantially diminished if it did not apply to agency rulemaking pursuant to the President's direction.

■■■ Rulemaking power delegated to the President by Congress generally must be exercised in accordance with the APA. At oral argument the defendants conceded that the President's power to order these interim regulations is derived solely from the delegation contained in Section 204.[17] If Section 553(b) has not been followed, an exception for the promulgation of these interim regulations must be found in Section 553 itself.

## B. Compliance

The defendants argue that they have complied with the APA's prior notice and comment provisions by publishing Executive Order 12,475 in the Federal Register May 11, 1984. The Secretary of the Treasury with policy guidance from CITA, was ordered to draft interim regulations relating to, *inter alia*, country of origin. The order cited authority for the rulemaking, and described "the subjects and issues involved" as required by 5 U.S.C. § 553(b)(2) & (3). The order failed to give the time and place of "the public rule making proceedings" as required by § 553(b)(1). The Court will not construe this order from the President to his subordinates as notice that Customs will conduct public proceedings on proposed country of origin and documentation rules. *See National Tax Brokers As-*

---

**15.** The notice stated:
Public notice is inapplicable to these regulations because they are promulgated pursuant to Section 204 of the Agricultural Act of 1956, as amended (7 U.S.C. 1854), and are thus within the foreign affairs function of the U.S. and the foreign affairs exemption of 5 U.S.C. 553(a)(1).
49 Fed.Reg. 31,251. The application of this exception is discussed at Part IV C, *infra*.

**16.** The interim regulations were issued by the Secretary of the Treasury, through the Customs Service, pursuant to authority delegated to the President in Executive Order 12,475.

**17.** The Constitution, art. I, § 8, cls. 1, 3 establishes "the complete power of Congress over foreign commerce and its authority to prohibit the introduction of foreign articles." *Weber v. Freed*, 239 U.S. 325, 329, 36 S.Ct. 131, 132, 60 L.Ed. 308 (1915); *Buttfield v. Stranahan*, 192 U.S. 470, 492–93, 24 S.Ct. 349, 354, 48 L.Ed. 525 (1904). The President's inherent authority in foreign affairs does not include the power to regulate imports. *See United States v. Yoshida Int'l, Inc.*, 63 CCPA 15, 22, 526 F.2d 560, 572 (1975).

sociations v. United States, 591 F.2d 896 (D.C.Cir.1978) (agency notice of formulation of possible legislation published in *Federal Register* held inadequate under the APA because it was published for purpose other than notice of proposed rulemaking).

The failure to provide the time and place is not merely a technical omission. The "principal purpose" of the notice and comment provisions of the APA was "to provide that the legislative functions of administrative agencies shall as far as possible be exercised only upon public participation on notice ..." *Administrative Procedure Act: Legislative History*, S.Doc. No. 248, 79th Cong., 2d Sess. 191 (1947) (Legislative History).

Participation by interested parties ensures that agencies' decisions are based upon relevant information, *See Texaco, Inc. v. Federal Power Commission*, 412 F.2d 740, 744 (3d Cir.1969), and fairly responsive to the interests and needs of the regulated, *See NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 764, 89 S.Ct. 1426, 1428, 22 L.Ed.2d 709 (1969); *City of Waco v. EPA*, 620 F.2d 84, 86 n. 8 (5th Cir.1980). Requiring that the time, place, and nature of the rulemaking be published, serves to inform the public when and where comments should be submitted.

The discussion of government officials with some interested parties does not cure the failure to provide *general* notice required by Section 553(b). The intent of the APA is to give the public a reasonable opportunity to comment on interim regulations before they take effect. *See Wagner Electric Corp. v. Volpe*, 466 F.2d 1013, 1019 (3d Cir.1972) (submission of comments by four interested parties does not remedy the inadequacies of the notice of proposed rulemaking).

The Court finds that Customs did not provide prior notice and opportunity to comment. The Court must now consider whether Customs was within one of the exceptions of Section 553(b).

*C. The "General Statements of Policy" Exception.*

■■■ The defendants contend that interim regulation § 18.11(e) is within the 5 U.S.C. § 553(b)(A) exemption of "general statements of policy" and should be exempt from the prior notice and comment provisions of the APA.

The Court agrees and finds interim regulations §§ 6.18(d),[18] 141.52 and 143.22 also exempt from prior notice and comment.

■■■ Where an "administrator [is] free to exercise his informed discretion in situations that arise" the rule is a general statement of policy which, as such, is exempt from the APA's prior notice and comment policy. *Guardian Federal Saving & Loan Association v. Federal Savings & Loan Insurance Corp.*, 589 F.2d 658, 666 (D.C. Cir.1978).

A rule is a general statement when it "does not establish a 'binding norm.' It is not finally determinative of the issues or rights to which it is addressed." *Pacific Gas & Electric Co. v. Federal Power Commission*, 506 F.2d 33, 38 (D.C.Cir.1974).

Interim regulation § 18.11(e) as promulgated in the August 3rd notice provided that textiles entered for in-bond transportation would not be approved without documentation describing the merchandise in sufficient detail to allow an estimation of the duties due and the correctness of the values or quantities on the entry (*e.g.*, a rated invoice). This interim regulation was amended by notice published in the Federal Register September 28, 1984. Interim regulation § 18.11(e) as amended, now states that "the district director *may*, if he deem necessary, require the following [specific] evidence," (emphasis added). In the opinion of the Court, interim regulation § 18.11(e), as amended, is discretionary and is exempt from the prior notice and comment provisions of APA under section 553(b)(A).

Interim regulation § 141.52 merely adds "import admissibility enforcement efforts"

---

18. Interim regulation § 6.18(d) provides that documentation required pursuant to § 18.11(e) must accompany transit manifest sheets accompanying air cargo shipments.

to the list of grounds of potential prejudice the district director can consider. Interim regulation § 143.22 adds the "import admissibility enforcement purposes" and "the efficient conduct of Customs business" to the district director's considerations in exercising his discretion of whether to require a formal consumption or appraisement entry for merchandise.

These amendments are nothing more than "general statement[s] of policy," *Guardian Federal,* 589 F.2d at 666, where the administrator is free to exercise his informed discretion in situations that arise. The Court holds that interim regulations § 18.11(e), § 141.52, and § 143.22 are within the "interpretive rules, general statements of policy" exception of 5 U.S.C. § 553(b)(A).

*D. The "Foreign Affairs Function" Exception*

■ The August 3, 1984 notice stated that the interim regulations are "within the foreign affairs function of the U.S. and the foreign affairs exemption of 5 U.S.C. 553(a)(1)." 49 Fed.Reg. 31,251. Section 553(a)(1) exempts from notice and comment, rulemaking "to the extent that there is involved a military or foreign affairs function of the United States".[19]

The defendants argue that executive action taken under Section 204 is always within the foreign affairs exception and that the interim regulations are inextricably intertwined with the MFA and the bilateral agreements in that the regulations are necessary to prevent their circumvention.

Plaintiffs would construe the exemption more narrowly, reading the legislative history of section 553(a)(1) to require application of the exemption only to diplomatic activities or where public notice and com-

ment would clearly provoke undesirable international consequences.

The meaning of a foreign affairs function is hardly clear. Cases construing the "foreign affairs function" exemption and the legislative history offer little guidance to the meaning of the term. The only court to have considered the applicability of the APA to actions taken under Section 204, *Consumers Union of the United States, Inc. v. Committee for the Implementation of Textile Agreements,* No. 74–968 (D.D.C.1975) *rev'd on jurisdictional grounds per curiam,* 561 F.2d 872 (D.C. Cir.1977), *cert. denied,* 435 U.S. 933, 98 S.Ct. 1509, 55 L.Ed.2d 531 (1978), found, without analysis, CITA's determination of the need to impose unilateral restraints on imports of textiles under the MFA within the "foreign affairs" exception. Slip op. at 15. There the challenged Executive action involved negotiation with other countries of import restrictions on textiles, not promulgation of Customs interim regulations.

Other cases interpreting the exception also fail to provide an analytical framework. *See, e.g., Malek-Marzban v. INS,* 653 F.2d 113, 116 (4th Cir.1981) ("obvious" that the President exercised a "foreign affairs function" in directing the Immigration and Naturalization Service to act against Iranian nationals during the Iranian hostage crisis).

The legislative history of this subsection is also not definitive. Both the Senate and House Reports on the APA state:

> The phrase "foreign affairs functions" used here and in some other provisions of the bill, is not to be loosely interpreted to mean any function extending beyond the borders of the United States, but only those "affairs" which so affect rela-

---

**19.** In its briefs the defendants also contend that the interim regulations are within the "good cause" exception of 5 U.S.C. § 553(b)(B), which provides that the prior notice and comment provisions do not apply "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefore in the rules issued) that notice and public procedure thereon are impracticable, unnecessary or contrary to the public interest." The Court need

not decide the question in view of its determination that the interim regulations which are not "general statements of policy" or "interpretive rules" are within the "foreign affairs function" exception. The defendants' prior argument that it complied with the notice provision of § 553(b) has not deterred them from taking the position that it did not comply since compliance would have been "impractical, unnecessary, or contrary to the public interest".

tions with other governments that, for example, public rulemaking provisions would clearly provoke definitely undesirable international consequences.

Legislative History at 199, 257. The exception cannot apply to functions merely because they have impact beyond the borders of the United States. "In our complex world there are very few purely internal affairs," *Briehl v. Dulles,* 248 F.2d 561, 591 (D.C.Cir.1957). But the phrase "clearly provoke definitely undesirable international consequences" appears illustrative. A finding of these consequences has not been considered necessary by courts [20] and a requirement of such a finding would render the "military or foreign affairs function" superfluous since the "good cause" exception, § 553(b)(B), would apply.

The defendants contend that since Section 204 permits the President to negotiate with other nations to limit textile imports, any regulation promulgated thereunder, even if only remotely relating to foreign affairs, is within the "foreign affairs function" exception. The Court disagrees. The legislative history demonstrates that it is the function of the regulations that is determinative, and not the source of the authority invoked. The report of the Senate Committee on the Judiciary on the bill that was to become the APA stated that the proposed legislation

has avoided the mistake of attempting to oversimplify the measure. It has therefore not hesitated to state functional classifications and exceptions where those could be rested upon firm grounds. In doing so, it has been the undeviating policy to deal with these types of functions as such and in no case with administrative agencies by name. Thus certain war and defense functions are exempted, but not the War or Navy Departments in the performance of their other functions.

Legislative History, at 191.

If the defendants' interpretation of the exemption were accepted, all Customs' regulations of the entry of textiles pursuant to Section 204 would be exempt from the APA's rulemaking requirements even if entirely domestic in impact.[21] *Cf. Yassini v. Crosland,* 618 F.2d at 1360 n. 4 ("foreign affairs function" exception "would become distended if applied to INS actions generally, even though immigration matters typically implicate foreign affairs").

The plaintiffs' argument that "foreign affairs functions" should be limited to diplomatic activities is not acceptable. The *Attorney General's Manual on the Administrative Procedure Act* (1947), "a contemporaneous interpretation [of the APA] previously given some deference by [the Supreme] Court because of the role played by the Department of Justice in drafting

**20.** *Nademi v. INS,* 679 F.2d 811, 814 (10th Cir. 1982); *Malek-Marzban v. INS,* 653 F.2d 113, 116 (4th Cir.1981); *Narenji v. Civiletti,* 617 F.2d 745, 748 (D.C.Cir.1979); *Hotel & Restaurant Employees Union v. Smith,* 563 F.Supp. 157, 162 (D.D.C. 1983); *Akbari v. Godshall,* 524 F.Supp. 635, 644 (D.Colo.1981); *Hou Ching Chow v. Attorney General,* 362 F.Supp. 1288, 1290–91 (D.D.C. 1973). *But see Jean v. Nelson,* 711 F.2d 1455, 1477–78 (11th Cir.1983); *Yassini v. Crosland,* 618 F.2d 1356, 1360 (9th Cir.1980). The Court finds the latter case distinguishable in that the regulations did not implement any agreement between the U.S. and Haiti limiting immigration into the U.S.

**21.** Customs responded to a survey by the Administrative Conference of the United States in 1969 by explicitly stating that none of its regulations were subject to the "foreign affairs function" exception. (Memorandum from Commissioner of Customs to General Counsel, Depart-

ment of Treasury, June 30, 1969, responding to survey.) The Department of the Treasury did state in response to a 1957 survey by the Committee on Government Operations of the House of Representatives that "foreign affairs functions" were conducted by Customs. *Survey and Study of Administrative Organization, Procedure and Practice in Administrative Agencies, House Committee on Government Operations,* 85 Cong., 1st Sess. 1064 (1957). Congress has been informed that at least portions of the textile import program have been considered subject to the foreign affairs exemption. *See Hearings on S. 518, Subcommittee on Administrative Practice and Procedure, Senate Committee on the Judiciary,* 90th Cong. 1st Sess. 373 (1967) (*Hearings on S. 518*) (Commerce Department testified as the need for secrecy in negotiation and administration of agreements); *Hearings on S. 518* at 241, (Labor Department testified that compliance could stimulate imports later subject to ceiling limits.)

the legislation," *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 546, 98 S.Ct. 1197, 1213, 55 L.Ed.2d 460 (1978) (footnote omitted) states that it is "clear that the 'foreign affairs' exemption is not limited to strictly diplomatic functions, because the phrase 'diplomatic function' was employed in the January 6, 1945 draft of the [APA] and was discarded in favor of the broader and more generic phrase 'foreign affairs function.'"

However defined, the exception applies "only 'to the extent' that the excepted subject matter is clearly and directly involved" in a "foreign affairs function". Legislative History at 275 (House Report). The courts in analyzing the section 553 exemptions, have continually stated that any claims of exemption from rulemaking procedures will be construed narrowly and granted reluctantly. *See, e.g., Environmental Defense Fund v. Gorsuch,* 713 F.2d 802, 816 (D.C.Cir.1983); *United States Steel Corp. v. EPA,* 595 F.2d 207, 214, *modified on rehearing,* 598 F.2d 915 (5th Cir.1979).

The question the Court must consider is whether the remaining interim regulations issued by Customs are "clearly and directly" involved "in a foreign affairs function." Each of them have a common purpose: prevention of the entry of textile products into the United States on quotas not applied to the country which manufactured all or a substantial part of the textile products.

Accordingly, interim regulation § 12.130 defines country of origin and establishes criteria for substantial transformation in order to prevent nearly completed textile

products of one country from being imported into the United States on the quota of another country.[22]

Similarly, interim regulations §§ 144.-38(f), 146.49 and 19.11 concern the withdrawal from a bonded warehouse or the transfer from a foreign trade zone of textile products subject to visa or license requirements if, while in the warehouse or foreign trade zone, they were changed so as to alter their country of origin, their textile quota category, or to exempt them from visa or export license requirements.

Finally, interim regulation § 12.131 requires formal entry for shipments of textile products subject to visa or export license requirements arriving for one consignee on the same conveyance on the same day, when the combined value is over $250. This regulation prevents the splitting of shipments to avoid quota restraints.

The defendants contend that the interim regulations are necessary to carry out and prevent the circumvention and frustration of the bilaterals by including textile products, now escaping from quota provisions, in a country's quota. The plaintiffs argue that the interim regulations violate existing textile agreements.

The negotiation of agreements with foreign governments under Section 204 does "clearly and directly" involve a "foreign affairs function." When the President defines, modifies or even violates the terms of an international agreement, or directs his subordinates to do so, that action is "clearly and directly" involved within the "foreign affairs function." [23] In this case,

---

**22.** Interim regulation § 12.130 also requires documentation to accompany the entry. These requirements are necessary procedures that show there has been compliance with the new country of origin provisions.

**23.** Article 8(1) of the MFA, negotiated by the President under this authority, provides that the "participating countries agree to avoid circumvention of this Arrangement by trans-shipment, re-routing or action by non-participants." It may be argued, as plaintiffs do, that the President has chosen not to comply with the consultative mechanisms established under the MFA

and the General Agreement on Tariff and Trade in promulgating the interim regulations. But that argument concedes that the President's acts affect the foreign relations of the United States. Violation of an international commitment, whether by the President or by the Congress—and the Court explicitly makes no such holding—is no less a "foreign affairs function" than the negotiation of such a commitment. *See Goldwater v. Carter,* 617 F.2d 697, 706 (D.C.Cir.) (per curiam), *vacated and remanded,* 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979).

Customs has issued these interim regulations pursuant to Presidential direction.

The Court holds that to the extent that the interim regulations define or alter quantitative limitations in bilateral trade agreements or unilaterally imposed restrictions on textile imports, they "clearly and directly" involve a "foreign affairs function" and are exempt from the prior notice and comment provisions of the APA.

The interim regulations go directly to the purpose of the trade agreements, *i.e.*, the limitation of textiles imported into the United States. With the promulgation of these interim regulations, textile products that would have avoided inclusion in a given country's quota now will be counted, thereby decreasing the quantity eligible for direct export to the United States or through another country's quota.

The Court finds that interim regulations §§ 12.130; 144.38(f); 146.49; 19.11 and 12.-131 are exempt from the prior notice and comment provision of section 553(a)(1) and are exempt from all the requirements of section 553.

## CONCLUSION

The President acted within the scope of the authority constitutionally delegated to him by Congress in issuing these interim regulations. The regulations are in accordance with the law. Furthermore, the interim regulations are not subject to prior notice and comment provisions of the APA since they come within the "foreign affairs function" or "general statement of policy" exceptions.

Accordingly, it is hereby ordered that defendants' motion for summary judgment is granted.