MAST INDUSTRIES, INC.,
**Plaintiff-Appellant,**

v.

**The UNITED STATES,**
**Defendant-Appellee.**

**Appeal No. 87–1182.**

United States Court of Appeals,
Federal Circuit.

June 25, 1987.

---

Steven P. Florsheim, Grunfeld, Desiderio, Lebowitz & Silverman, New York City, argued, for plaintiff-appellant. With him on the brief, was Robert B. Silverman.

Susan Handler-Menahem, Commercial Litigation Branch, Dept. of Justice, New York City, argued, for defendant-appellee. With her on the brief, were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director and Joseph I. Liebman, Atty. In Charge, Intern. Trade Field Office.

Before FRIEDMAN and DAVIS, Circuit Judges, and NICHOLS, Senior Circuit Judge.

NICHOLS, Senior Circuit Judge.

Mast Industries, Inc. (Mast) appeals from the judgment of the United States Court of International Trade, 652 F.Supp. 1531 (Ct. Int'l Trade 1987), affirming the decision of the United States Customs Service (Customs) that operations performed on Mast's fabric in Hong Kong did not substantially transform the fabric, originally from the People's Republic of China (P.R.C.), for

purposes of determining the country of origin and the appropriate Customs treatment under 19 C.F.R. § 12.130. We affirm.

## Background

On approximately July 23, 1986, Mast attempted to enter a shipment of fabric into the United States at John F. Kennedy Airport in New York. This fabric was produced in the P.R.C. in unfinished form and then processed in Hong Kong prior to reaching the United States. Mast presented an entry visa for the goods from Hong Kong believing that was the proper country of origin. Customs disagreed, viewing the goods as products of the P.R.C., and denied entry finding that the goods lacked the proper visa.

In the P.R.C., the fabric involved in this case went through various processes that transformed it from raw cotton to unfinished fabric, known as "greige" goods. These goods were then subject to a variety of additional processes in Hong Kong. These included dyeing and not printing. The operation of these two stages is presented in detail in Judge Carman's opinion. 652 F.Supp at 1534–35.

Both Customs and Mast presented contradictory evidence to the Court of International Trade on whether a substantial transformation of the goods occurred in Hong Kong. Mast presented evidence that the greige goods changed in commercial identity and value after the Hong Kong work was completed. There were several manufacturing steps taken in Hong Kong, and they allegedly added substantially to the money value of the goods. Customs argued the opposite, essentially that the fundamental character of the goods had not changed after the goods left the P.R.C.

Judge Carman did not reach the conflict between this testimony, noting that it was not directed at the dispositive issue of whether the case falls within the purview of 19 C.F.R. § 12.130 (e)(1) and (e)(2). The court found that dyeing *and* printing, as well as two other major processes, had not taken place and concluded that the regulation specifically precluded a finding of substantial transformation. The court based this conclusion on the clear meaning of the regulation, the relevant "legislative history," and the interpretation offered by Customs of its own regulation.

## Analysis

### I

This case concerns the interpretation of the "country of origin" regulation, 19 C.F.R. § 12.130, designed by Customs to facilitate administration of the textile import program and to prevent circumvention of multilateral and bilateral textile agreements. 50 Fed.Reg. 8710–11 (1985) (codified at 19 C.F.R. § 12.130). We need not repeat Judge Carman's able review of the background to this textile regulation. Suffice it to say that the regulation was adopted in a "regulatory vacuum," where ad hoc determinations had been the rule of the day, resulting in import treatment inconsistent with the various textile agreements as they had been intended to be. The President was authorized to make regulations and Customs made them under delegated authority. 7 U.S.C. § 1854; Exec. Order No. 12,475, 3 C.F.R. 203 (1985). The old method of statutory definition, to be interpreted by judicial decision, was not working well. If the agreements were to serve their purpose, they had to be construed by persons familiar with their background, and with the trade with which they dealt.

The general provision of the regulation is as follows:

(b) *Country of origin.* * * * [A] textile or textile product, subject to section 204, Agricultural Act of 1956, as amended, imported into the customs territory of the United States, shall be a product of a particular foreign territory or country, or insular possession of the U.S., if it is wholly the growth, product, or manufacture of that foreign territory or country, or insular possession. However * * * a textile or textile product, subject to section 204, which consists of materials produced or derived from, or processed in, more than one foreign territory or country, or insular possession of the U.S., shall be a product of that foreign territo-

ry or country, or insular possession where it last underwent a substantial transformation. A textile or textile product will be considered to have undergone a substantial transformation if it has been transformed by means of substantial manufacturing or processing operations into a new and different article of commerce.

19 C.F.R. § 12.130(b).

The controversy in this case concerns the issue of substantial transformation and whether an importer has any grounds to escape the seemingly clear language of the regulation as it addresses printing and dyeing, which is as follows:

(e) *Manufacturing or processing operations.* (1) An article or material *usually* will be a product of a particular foreign territory or country, or insular possession of the U.S., when it has undergone prior to importation into the U.S. in that foreign territory or country, or insular possession any of the following:

(i) Dyeing of fabric *and* printing when accompanied by two or more of the following finishing operations: bleaching, shrinking, fulling, napping, decating, permanent stiffening, weighting, permanent embossing, or moireing;

\*　　\*　　\*　　\*　　\*　　\*

*Id.* § 12.130(e)(1)(i) (emphasis supplied).

The complement to the above-cited portion is as follows:

(2) An article or material *usually* will not be considered to be a product of a particular foreign territory or country, or insular possession of the U.S. by virtue of merely having undergone any of the following:

\*　　\*　　\*　　\*　　\*　　\*

(v) Dyeing and/or printing of fabrics or yarns.

*Id.* § 12.130(e)(2)(v) (emphasis supplied).

■ Mast, arguing on appeal much of what it presented to the trial court, contends that the regulation is merely illustrative and, when read with the word "usually" in the two quoted sections, means that either printing *or* dyeing, when accompanied with other processes, may be suffi-

cient for substantial transformation. We disagree. Although the examples provided in the regulation are not all encompassing, the regulation does address printing and dyeing. As a matter of statutory interpretation, the language itself must be given considerable weight. *See Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) (statutory language must ordinarily be regarded as conclusive in the absence of clearly expressed legislative intent to the contrary). Neither the provisions of the statute nor the "legislative history" support Mast's contentions in this case.

■ The word "usually" should be read in conjunction with 19 C.F.R. § 12.130(d):

(d) *Criteria for determining country of origin.* The criteria in paragraphs (d)(1) and (2) of this section shall be considered in determining the country of origin of imported merchandise. These criteria are not exhaustive. One or any combination of criteria may be determinative, and additional factors may be considered.

*Id.*

This language suggests that the regulation is flexible and allows Customs to address circumstances not contemplated, such as where a new or unusual process is used in treating textiles. Although the language of this section addresses the *general* guidelines of 19 C.F.R. § 12.130(d), we note it does not in any way modify the examples set out in paragraph (e).

The emphasis Mast places on "usually" in the regulation implies that the general discretion available to Customs under the regulation in some way diminishes the meaning of the specific examples provided in the regulation regarding printing and dyeing and other processes. Essentially Mast argues that the requirement of printing *and* dyeing does not control when there are other processes applied to the fabrics not set out in 19 C.F.R. § 12.130(e)(1)(i). There is no support for this position.

The Customs service addressed the example of printing and dyeing during the rulemaking proceedings:

> Customs believes it is appropriate to amplify on the dyeing or printing example in the interim regulations to provide better guidance on the type or types of operations that will result in a change in the country of origin. Three examples concerning finishing operations have been inserted in the final regulations which are more specific and convey Customs views that, in the case of fabrics, usually any finishing operations short of a combination of both dyeing and printing together with at least two other major finishing operations will not result in a substantial transformation of the fabric.

50 Fed.Reg. at 8713.

This passage provides direct support for a reading of the already clear language of the regulation as requiring both printing and dyeing. It is not inconsistent with the idea that we have here a "bright line," meant for ready application, both in the Customs house and in the Court of International Trade, without the need to reweigh disputed facts for every new customs entry. In our view Customs suggests in these comments that printing and dyeing is a threshold requirement and that discretion may be exercised in determining whether the two other finishing operations are "major."

■ The regulation provides, at most, discretion for Customs to deviate from the examples provided in the regulation when unusual circumstances arise. There is nothing to show the operations performed on the fabrics here involved were unusual circumstances. Mast provides no evidence of legislative intent, moreover, to lead this court to conclude that the regulation does not permit the interpretation adopted by Customs and upheld by the trial court, viewing the existence of printing and dyeing as determinative. Although we do not see this as a close case, to the extent that there is any degree of interpretation of the Customs regulation, an agency's interpretation of its own regulation must be given substantial weight by a reviewing court. *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). "[T]he ultimate criterion is the administrative interpretation, which becomes controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Id.* at 414, 65 S.Ct. at 1217. We hold that the interpretation of 19 C.F.R. § 12.130(e)(1)(i) by Customs, and upheld by the trial court, was not erroneous.

## II

■ As an alternative to arguments on the meaning of the regulation, Mast contends that the court should have considered the evidence Mast presented on the various processes applied to Mast's fabrics. Again, we disagree. The conclusion reached by the trial court, which we uphold, is that the question whether both printing *and* dyeing were done in a particular case is determinative. Since no printing was done, it was unnecessary for the court to discuss the evidence of other processing operations applied to the fabrics in this case. If the court had reached these other operations as part of its analysis, it would have implicitly disagreed with Customs' view of these regulations, which both the trial court and this court view as quite reasonable.

■ Mast's final and meritless contention is that the court failed to consider caselaw developed prior to the enactment of the regulation. As Judge Carman noted, the regulation in issue was adopted to provide guidance in the absence of judicial or legislative direction on the subject of "country of origin" for textile quota purposes. Mast, in prior litigation, challenged the validity of these regulations as, *inter alia*, contrary to prior caselaw and did not prevail. *Mast Industries, Inc. v. Regan*, 596 F.Supp. 1567, 1576–77, 8 C.I.T. 214 (1984). As such, the valid regulation and not caselaw controls this case. This case law is considered the source of the evil the regulation was meant to correct, and thus it is something to avoid, not to seek out for guidance. One case specifically, *Cardinal Glove Co. v. United States*, 4 C.I.T. 41 (1982), was considered a threat to the fu-

ture administration of the trade agreements. 50 Fed.Reg. 8711 (1985) (codified at 19 C.F.R. § 12.130).

### III

Of course, it is possible the regulation, as we interpret it, may produce operations in Hong Kong or elsewhere, combining dyeing and printing, not for any economic or functional reason, but simply to obtain a favorable country-of-origin determination. The more familiar one is with the past history of customs administration and litigation, the less surprised one would be by such a development. It is not this case, however, and can be dealt with if it occurs. The regulation may point out a loophole through which Hong Kong could qualify as the country of origin, though only by means of a sham transaction. If Customs made a mistake in not anticipating such a development, it is not the kind of mistake the judiciary was created to correct.

■ As the trial court made no finding, it is also possible the combination of dyeing and printing the same fabric may be, as some testimony asserted, generally useless and therefore rare. It might have been simpler to have said mere finishing of greige goods from elsewhere will not "ever" or "usually" make the country of finishing the country of origin. This does not establish, however, that Customs meant in the regulation we have something other than what it said. It is not unheard of for a legislative or regulatory body to write in such a way as to seem to grant, but inartistically, a benefit it really means to deny. *Cf. Aparacor, Inc. v. United States,* 571 F.2d 552, 215 Ct.Cl. 596 (1978). The draftsman's tongue may be planted firmly in cheek, or it may be a good faith error, but in either case, sufficient handle is not afforded to courts to read the language as meaning something other than what it plainly says. Courts do this only in rare instances, when the result of a literal reading is absurd, and contrary to actual intent as shown by legislative history or the statutory structure taken as a whole. *Ambassador Division of Florsheim Shoe v. United States,* 748 F.2d 1560, 3 Fed.Cir.

(T) 28 (Fed.Cir.1984). The result here is not absurd and there is no real evidence of any intent contrary to the literal language. So far as appears, Customs could have said directly that greige goods never become a new and different product by mere finishing, and if they said so indirectly, as some testimony would seem to show, that does not justify frustrating Customs' intent.

### Conclusion

We conclude that the interpretation of 19 C.F.R. § 12.130(e)(1)(i) as requiring printing *and* dyeing is reasonable and consistent with legislative intentions. We affirm.

AFFIRMED.