**MAST INDUSTRIES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Court No. 86–9–01145.**

United States Court of
International Trade.

Decided: Jan. 14, 1987.

Grunfeld, Desiderio, Lebowitz & Silverman (Steven P. Florsheim) for plaintiff.

Richard K. Willard, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch, U.S. Dept. of Justice, Susan Handler-Menahem, New York City, for defendant.

**OPINION AND ORDER**

CARMAN, Judge:

This case concerns the country of origin question and the doctrine of substantial transformation, as set forth in Textiles and Textile Products Country of Origin, 19 C.F.R. § 12.130 (1986), as applied to 100% cotton fabric piece goods manufactured in their most basic, crude form in the People's Republic of China (P.R.C.) and subsequently subjected to certain processes in Hong Kong. The issue before this Court concerns whether or not the merchandise, which is the subject of this action, underwent substantial manufacturing or processing operations in Hong Kong sufficient to transform basic cotton goods, from the P.R.C., into new and different articles of commerce, consequently establishing a new country of origin, i.e., Hong Kong. This Court holds the manufacturing and/or processing operations performed in Hong Kong were not sufficient to establish Hong Kong as the country of origin.

Plaintiff, Mast Industries, Inc. (Mast), commences this action against the defendant, the United States Customs Service (Customs) requesting this Court overrule the Customs' decision denying entry of certain 100% cotton piece goods (fabric) im-

ported by Mast into the United States from Hong Kong. Mast also requests this Court to direct the Regional Commissioner of Customs in New York to forthwith permit entry of this merchandise as a product of Hong Kong. Customs requests this Court overrule plaintiff's claims, sustain the decision of the appropriate Customs official, dismiss the action, and grant defendant such other and further relief as may be just and appropriate. This Court must examine the propriety of Customs' denial of entry of the Mast fabric in light of the facts and the language of the regulation.

## FACTS

It is important, as noted in the brief for Customs and the amicus curiae brief submitted by the American Textile Manufacturers Institute, Inc., to examine the background behind the promulgation of 19 C.F.R. § 12.130. There existed a virtual regulatory vacuum for "country of origin" determinations for textile quota purposes prior to the enactment of these regulations. This vacuum apparently resulted in a series of *ad hoc* and unilateral decisions by individual importers on how the textile quotas would actually be administered. The supplemental information contained in Customs Regulations Amendments Relating to Textiles and Textile Products, 50 Fed.Reg. 8710 (1985) (codified at 19 C.F.R. § 12.130) supplies us with an account of what prefaced the promulgation of these regulations:

In order to implement import policies with respect to textiles and textile products, Congress provided authority to the President to negotiate textile restraint agreements in section 204 of the Agricultural Act of 1956, as amended (7 U.S.C. 1854), and authority to carry out such agreements by issuing regulations governing the entry of merchandise covered by the agreements into the United States.

In December, 1973, representatives of 50 nations meeting under the General Agreement on Tariff and Trade (GATT) aegis, negotiated the Multi-Fiber Arrangement Regarding International Trade in Textiles. The arrangement is usually known as the Multi-Fiber Arrangement, or MFA, and came in force on January 1, 1974. It was subsequently renewed and next expires on July 31, 1986.

Under the MFA, the U.S. has negotiated numerous bilateral restraint agreements. The U.S. also has several bilateral agreements with MFA non-signatories. The Committee for the Implementation of Textile Agreements (CITA) was established by Executive Order 11651 on March 3, 1972, to supervise the implementation of textile agreements. The future administration of these agreements was severely jeopardized by the decision of the United States Court of International Trade in *Cardinal Glove Co. v. United States* 4 C.I.T. 41, which concluded that, absent specific regulatory authority to the contrary, the bilateral textile agreement at issue therein was applicable only to textile products in which the agreement country was the "country of exportation." Furthermore, the U.S. Customs Service was faced with an ever increasing number and variety of instances where attempts had been made to circumvent the textile import program.

50 Fed.Reg. at 8711.

There was no guidance available concerning "country of origin" determinations for textile quota purposes. There was no substantive regulation, no specific documentation required, and no substantial judicial guidance. There were also few relevant Customs Service rulings. The Federal Register's comments on the background to the regulations, as quoted above, continue:

In part because of these problems and in order to prevent circumvention or frustration of the various multilateral and bilateral agreements to which the U.S. is a party and to facilitate efficient and equitable administration of the U.S. Textile Import Program, the President signed Executive Order 12475 on May 9, 1984. Under the Executive Order the Secretary of the Treasury was required to promulgate regulations governing the entry of textiles and textile products subject to section 204, Agricultural Act of

1956 within 120 days of the May 11, 1984, effective date of the Executive Order. Interim Customs Regulations implementing the Executive Order were published in the Federal Register on August 3, 1984 as T.D. 84–171 (49 FR 31248). Customs further requested public comment on the interim regulations. Over 650 comments were received in response to the solicitation of comments. A discussion of the interim regulations, comments received, changes made to the interim regulations during the comment period and further changes made by this document as a result of the comments are set forth below.

50 Fed.Reg. at 8711.

On March 5, 1985, the Commissioner of Customs issued the "country of origin" regulation, 19 C.F.R. § 12.130 (1985). The Commissioner explained this regulation was designed "to prevent circumvention or frustration of visa or export license requirements contained in multilateral and bilateral agreements to which the U.S. is a party in order to facilitate the efficient and equitable administration of the U.S. Textile Import Program." 50 Fed.Reg. 8710–8711. The Commissioner also discussed the Final Regulations in light of the comments received on the Interim Regulations.

The regulation states in pertinent part:

(b) *Country of origin.* For the purpose of this section and except as provided in paragraph (c), a textile or textile product, subject to section 204, Agricultural Act of 1956, as amended, imported into the customs territory of the United States, shall be a product of a particular foreign territory or country, or insular possession of the U.S., if it is wholly the growth, product, or manufacture of that foreign territory or country, or insular possession. However, except as provided in paragraph (c), a textile or textile product, subject to § 204, which consists of materials produced or derived from, or processed in, more than one foreign territory or country, or insular possession of the U.S., shall be a product of that foreign territory or country, or insular possession where it last underwent a substantial transformation. A textile or tex-

tile product will be considered to have undergone a substantial transformation if it has been transformed by means of substantial manufacturing or processing operations into a new and different article of commerce.

\* \* \* \* \* \*

(d) *Criteria for determining country of origin.* The criteria in paragraphs (d)(1) and (2) of this section shall be considered in determining the country of origin of imported merchandise. These criteria are not exhaustive. One or any combination of criteria may be determinative, and additional factors may be considered.

(1) A new and different article of commerce will usually result from a manufacturing or processing operation if there is a change in:

(i) Commercial designation or identity,

(ii) Fundamental character or

(iii) Commercial use.

(2) In determining whether merchandise has been subjected to substantial manufacturing or processing operations, the following will be considered:

(i) The physical change in the material or article as a result of the manufacturing or processing operations in each foreign territory or country, or insular possession of the U.S.

(ii) The time involved in the manufacturing or processing operations in each foreign territory or country, or insular possession of the U.S.

(iii) The complexity of the manufacturing or processing operations in each foreign territory or country, or insular possession of the U.S.

(iv) The level or degree of skill and/or technology required in the manufacturing or processing operations in each foreign territory or country, or insular possession of the U.S.

(v) The value added to the article or material in each foreign territory or country, or insular possession of the U.S., compared to its value when imported into the U.S.

(e) *Manufacturing or processing operations.* (1) An article or material usually will be a product of a particular foreign territory or country, or insular possession of the U.S., when it has undergone prior to importation into the U.S. in that foreign territory or country, or insular possession any of the following:

(i) Dyeing of fabric and printing when accompanied by two or more of the following finishing operations: bleaching, shrinking, fulling, napping, decating, permanent stiffening, weighting, permanent embossing, or moireing;

(ii) Spinning fibers into yarn;

(iii) Weaving, knitting or otherwise forming fabric;

(iv) Cutting of fabric into parts and the assembly of those parts into the completed article; or

(v) Substantial assembly by sewing and/or tailoring of all cut pieces of apparel articles which have been cut from fabric in another foreign territory or country, or insular possession, into a completed garment (*e.g.* the complete assembly and tailoring of all cut piece [sic] of suit-type jackets, suits, and shirts).

(2) An article or material usually will not be considered to be a product of a particular foreign territory or country, or insular possession of the U.S. by virtue of merely having undergone any of the following:

(i) Simple combining operations, labeling, pressing, cleaning or dry cleaning, or packaging operations, or any combination thereof;

(ii) Cutting to length or width and hemming or overlocking fabrics which are readily identifiable as being intended for a particular commercial use;

(iii) Trimming and/or joining together by sewing, looping, linking, or other means of attaching otherwise completed knit-to-shape component parts produced in a single country, even when accompanied by other processes (*e.g.* washing, drying, mending, etc.) normally incident to the assembly process;

(iv) One or more finishing operations on yarns, fabrics, or other textile articles, such as showerproofing, superwashing, bleaching, decating, fulling, shrinking, mercerizing, or similar operations; or

(v) Dyeing and/or printing of fabrics or yarns.

19 C.F.R. § 12.130(b), (d), (e) (1986). In light of this regulation we turn to the following facts which have been established by depositions and testimony presented at trial.

The plaintiff, Mast, on or about July 23, 1986, attempted to enter a shipment of fabric into the JFK Airport area of New York. The shipment was excluded from entry by Customs. The merchandise was manufactured in its unfinished form in the P.R.C., was imported to Hong Kong, underwent some processing, and continued on its journey to the United States where it was denied entry because it lacked the proper required entry visa from the country of origin of the goods. Mast presented an entry visa from Hong Kong believing Hong Kong was the country of origin, but Customs determined the country of origin for the goods was the P.R.C. Mast was unable to get a P.R.C. visa for the fabric. A more thorough discussion of the manufacturing and processing operations performed on the merchandise in both countries is necessary before examining the country of origin decision by Customs.

The fabric in question was produced in the P.R.C. from cotton that is planted, grown, picked, and then processed through a cotton gin. The gin cleans the cotton by removing the seeds and other, but not all, foreign matter. The cotton is then baled and sent to a fabric mill where the cotton is repeatedly cleaned and brushed by various machines in order to produce a parallelization of the cotton fibers.

There are a series of cleaning machines employed in the preparation of the fiber as well as a lap machine which changes the fiber into a pulpy substance and a carding machine which begins the process of parallelization of the fibers. The fibers must be

subjected to separating, cleaning, and parallelization processes before the fibers can be inserted into more machines which reduce the diameter of the fibers, and twist and strengthen them. The fibers are then wound onto a bobbin and loaded onto a spinning frame where the fibers are spun into yarn.

After the yarn is wound, it is separated into two categories to be designated as warp yarn or weft yarn. Warp yarn is the vertical yarn of a fabric; weft yarn is the horizontal. Once designated, the yarn is then placed on a loom to weave the yarn into fabric. Depending upon the different mechanisms of a loom, the warp and weft yarn can be woven under and across each other in different intervals to produce typically a 3 by 1 twill or a 2 by 1 twill. When the yarn has been woven into fabric, the fabric is removed from the loom, cut, and rolled accordingly.

The unfinished fabric is usually referred to in the textile industry as "greige" goods or "greige" fabric. This is the basic, crude, unfinished fabric which will usually require a certain amount of processing to convert the fabric into a usable "ready for the needle" product.[1]

## DISCUSSION

The issue before this Court is apparently one of first impression and concerns the "country of origin" of certain merchandise Mast has tried to enter into the United States. The country of origin is determined by establishing in which country the goods last underwent a substantial transformation. This, in turn, is established by considering whether or not the goods were transformed by means of substantial manufacturing or processing operations into a new and different article of commerce. There is no prior case law which controls this area of law. All parties agree 19 C.F.R. § 12.130 entitled "Textiles and textile products country of origin" controls the matter at hand. The Customs Service recently promulgated this regulation to provide a clear set of criteria for determining the country of origin of imported textile products for quota purposes.

Concerning the issue at hand, the regulation states a textile product, processed in

---

1. Testimony, from both parties' witnesses, established the preprocessed rough material has a limited use in which it may be sewn and slightly processed to make work gloves or not processed at all to produce painters' dropcloths and painters' pants. A number of the processes to which the "greige" fabric is subjected are as follows:

1. Singeing is accomplished by passing the goods at a relatively high speed over lighted gas jets. This process removes extraneous fibers or "hairs" from the surface of the greige fabric and thereby results in a smoother appearance. It also promotes a more uniform application of color during the dyeing process.

2. Desizing is where the goods are subjected to an enzyme bath which digests the sizing starches and permits their removal from the greige fabric. The goods are then washed to rinse away the digested starch materials.

3. With scouring, the material is subjected to a hot caustic soda solution to remove many of the impurities still remaining in the material.

4. Bleaching is accomplished through application of a peroxide or chlorine solution which removes additional foreign matter still present in the material and whitens the fabric.

5. Mercerizing uses a cool caustic soda solution which is applied to the fabric while under tension. This causes a swelling of the cotton fibers which improves the dyeability of the fabric, produces rich colors, and gives the fabric surface increased sheen or luster.

6. Dyeing is the process whereby the fabric is subjected to dyestuff solutions.

7. Softening occurs when a chemical substance is applied to the fabric to make it soft to the touch, or "hand." It can be done by the same machinery which does the width adjustment, or tentering.

8. Tentering is the process which adjusts the width of the fabric through the use of pins or clips on a conveyer system in the presence of steam or heat. This process is also referred to as "stentering," which is the British term for this process.

9. Pre-shrinking is sometimes referred to as sanforizing and is a mechanical shrink control process. Pre-shrinking will minimize shrinkage of the fabric after it is sewn into a garment and laundered.

10. Finally, the finished product is inspected, measured, and packed prior to its shipment to the garment manufacturer.

It should be noted after each wet process, i.e., desizing, scouring, bleaching, mercerizing, dyeing and softening, the material must be dried. This drying is accomplished by running the material over a series of steam heated rollers.

more than one country, is the product of the country where it last underwent a substantial transformation. The regulation sets forth, in pertinent part, what constitutes a substantial transformation:

A textile or textile product will be considered to have undergone a substantial transformation if it has been transformed by means of *substantial manufacturing or processing operations into a new and different article of commerce.*

19 C.F.R. § 12.130(b) (emphasis added).

For a substantial transformation to have occurred, the regulation explains, the textile product must have been "transformed by means of substantial manufacturing or processing operations into a new and different article of commerce." 19 C.F.R. § 12.130(b). What becomes the difficult task is determining what constitutes "substantial manufacturing or processing operations" and what constitutes "a new and different article." The regulation although previously quoted, lends some clarity and bears repeating here in part:

(d) *Criteria for determining country of origin.* The criteria in paragraphs (d)(1) and (2) of this section shall be considered in determining the country of origin of imported merchandise. These criteria are not exhaustive. One or any combination of criteria may be determinative, and additional factors may be considered.

(1) A new and different article of commerce will usually result from a manufacturing or processing operation if there is a change in:

(i) Commercial designation or identity,

(ii) Fundamental character or

(iii) Commercial use.

* * * * * *

(e) *Manufacturing or processing operations.* (1) An article or material *usually will be* a product of a particular foreign territory or country, or insular possession of the U.S., when it has undergone prior to importation into the U.S. in that foreign territory or country, or insular possession any of the following:

(i) *Dyeing of fabric and printing when accompanied by two or more of the following finishing operations:* bleaching, shrinking, fulling, napping, decating, permanent stiffening, weighting, permanent embossing, or moireing;

* * * * * *

(2) An article or material *usually will not be* considered to be a product of a particular foreign territory or country, or insular possession of the U.S. by virtue *of merely having undergone any of the following:*

* * * * * *

(iv) *One or more* finishing operations on yarns, fabrics, or other textile articles, such as showerproofing, superwashing, bleaching, decating, fulling, shrinking, mercerizing, or similar operations; *or*

(v) Dyeing and/or printing of fabrics or yarns.

19 C.F.R. § 12.130 (emphasis added).

Testimony was presented by both parties concerning the three criteria to consider under subsection (d)(1). Mast presented expert testimony which supported the proposition the merchandise in question changed in its commercial designation or identity from "greige" goods to "finished" fabric due to the processes performed on the merchandise in Hong Kong. Customs, in direct opposition, presented expert testimony which established "greige" fabric is commonly referred to in the trade as "fabric," the same title applied to "finished" fabric.

Mast also strenuously argued after the fabric was subjected to extensive processing, the "greige" goods were transformed into a substantially new product "ready for the needle." It offered proof at the trial indicating there were dealers in "greige" goods markets and other dealers who dealt in distinctively different markets with finished fabric. Furthermore, Mast offered evidence indicating there was often a significant change in the value of the goods after the processing took place. This aug-

mentative value could apparently be as much as 20–30%.

Customs, on the other hand, argued just the reverse was true. It presented testimony the fabric's fundamental character had not changed from the processes in Hong Kong. The fabric was substantially, if not totally, complete at the time it was manufactured in China. Evidence was presented both finished and greige fabric are usable in the manufacture of garments. Customs contended fabric was essentially complete in its greige form for some garment applications and, at the least, was merely unfinished fabric for other garment applications requiring a modification of aesthetics. Mast's witnesses also concurred "greige" goods could be sold to a limited commercial market.

Both parties presented additional testimony supporting their contentions the facts applied to the criteria listed under subsection (d)(2) weighed more in their respective favor concerning a substantial manufacturing or processing operation than in the opposing side's favor.

The difficulty with all these arguments, as persuasive as they may be, is they fail to address the issue of whether or not Customs, through its regulations, has precluded certain marginal processes from being considered as sufficient to establish a substantial transformation has occurred. The regulation seems clear, under subsection (e), that in dealing with fabrics, finishing operations involving less than a combination of dyeing and printing together with at least two other major finishing operations will not usually result in a substantial transformation of the fabric.

The comments of the Customs Service in the Federal Register, prior to the promulgation of this regulation, underlines this legitimate concern of the agency:

> Customs believes it is appropriate to amplify on the dyeing or printing example in the interim regulations to provide better guidance on the type or types of operations that will result in a change in the country of origin. Three examples concerning finishing operations have been inserted in the final regulations which are more specific and *convey Customs views that, in the case of fabrics, usually any finishing operations short of a combination of both dyeing and printing together with at least two other major finishing operations will not result in a substantial transformation of the fabric.*
>
> To satisfy the objections of some commenters that certain marginal processing should not result in a substantial transformation, Customs has added language in § 12.130(e)(2) in the final rule indicating that dyeing or printing, or dyeing and printing of fabrics and yarns, or one or more finishing operations on yarns, fabrics, or garments, such as showerproofing, superwashing, bleaching, decating, fulling, shrinking, mercerizing, or similar operations, will not usually result in a substantial transformation.

50 Fed.Reg. at 8713 (emphasis added).

While it is not the purpose of this determination to delve into the administrative reasons for all of these regulations, it is not difficult to surmise Customs, in the administration of its obligations, deems desirable the avoidance of deciding on a case by case basis if various marginal operations result in a substantial transformation. It does not take much imagination to envision circumstances where one importer could argue bleaching, decating, and fulling result in substantial transformation and in another case argue only bleaching and decating are sufficient. An administrative nightmare could result.

The evidence produced at trial established the existence of many of the so-called marginal processes performed on the fabric which is the subject of this case. It was, nevertheless, also established at the trial none of the fabric was subjected to dyeing *and* printing and accompanied by two or more finishing operations such as bleaching, shrinking, fulling, napping, decating, permanent stiffening, weighting, permanent embossing, or moireing.

When the construction of an administrative regulation is at issue, deference shall be given to the regulation's interpretation made by the officers or agency charged

with its administration. The administrative interpretation of an administrative regulation becomes the controlling factor unless it is plainly erroneous or inconsistent with the regulation. *Udall v. Tallman* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *see also United States v. Larionoff* 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); *Melamine Chemicals, Inc. v. United States*, 732 F.2d 924 (Fed.Cir.1984).

Accordingly, this Court determines, from the above analysis, it was not erroneous or inconsistent with 19 C.F.R. § 12.130, and certainly not unreasonable for Customs to have concluded the country of origin of the goods Mast was trying to enter, was the P.R.C. Therefore, it was proper for Customs, pursuant to the regulations, to require Mast to submit the proper documentation, including an entry visa from the P.R.C. As stated before, this Court must give deference to Customs' interpretation of its own administrative regulation, provided its decisions are not erroneous or inconsistent with that regulation.

### CONCLUSION

For the reasons stated, the complaint of plaintiff is dismissed, and the determination of Customs denying entry of the finished fabric by plaintiff under the Hong Kong visa is sustained.

Judgment will be entered accordingly.