**TARGET SPORTSWEAR, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Slip Op. 95-7.**
**Court No. 93–12–00833.**

United States Court of
International Trade.

Jan. 23, 1995.

Wasserman, Schneider & Babb, New York City (Jack Gumpert Wasserman, Bernard Babb and David M. Steiner), Howard P. Roy, Gen. Counsel, Target Sportswear, Inc., of counsel, for plaintiff.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice (Rob-

ert J. Krask), David J. Weiler, Office of the Chief Counsel for Int'l Commerce; Laura R. Siegel, Gen. Atty., Office of the Asst. Chief Counsel, Int'l Trade Litigation, U.S. Customs Service, Washington, DC, of counsel, for defendant.

Rosalie Simmonds Ballentine, Atty. Gen. of the Virgin Islands, Charlotte Amalie, St. Thomas, VI (Joseph M. Erwin, Asst. Atty. Gen. (Tax), Virgin Islands Dept. of Justice) and Winston & Strawn, Washington, DC (Peter N. Hiebert), of counsel, amicus curiae in support of plaintiff.

## OPINION

NEWMAN, Senior Judge:

### Introduction

A rejection by the United States Customs Service ("Customs") of plaintiff's entry of men's suits exported from the U.S. Virgin Islands due to plaintiff's failure to submit an export visa from the Dominican Republic, where the suits were assembled, showing compliance with quota restrictions on Dominican Republic textile products, as required by a 1993 interim regulation, precipitated this litigation.

Section 204 of the Agricultural Act of 1956, as amended, 7 U.S.C. § 1854 ("§ 204"), authorizes the President to negotiate agreements with foreign governments to limit the quantity of imports into the United States of textiles and textile products of such foreign countries and to issue regulations to carry out such agreements. Plaintiff, Target Sportswear, Inc. ("Target"), a United States importer of men's suits from the U.S. Virgin Islands, challenges the validity of 19 C.F.R. § 12.130(c)(2), effective May 14, 1993, T.D. 93–27, an interim regulation promulgated by the Commissioner of Customs concerning rules of country of origin for textiles and textile products imported from insular possessions, including the U.S. Virgin Islands ("interim regulation").[1]

---

1. On April 14, 1993, the interim regulation was published in the Federal Register, *Country of Origin of Textile Products From U.S. Insular Possessions,* 58 Fed.Reg. 19347, 19349 (April 14, 1993) and became effective 30 days later, on May 14, 1993. Interim Regulation 19 C.F.R. § 12.130(c)(2), published as T.D. 93–27, added part (c)(2) to the original country of origin regulation § 12.130 finalized in T.D. 85–38, 50 Fed. Reg. 8710 (March 5, 1985).

■ At issue is the scope of the President's congressionally-delegated authority in conformance with § 204 to issue country of origin regulations to carry out textile trade agreements negotiated pursuant to the statute.[2] Specifically in dispute is the President's authority to make a narrow exception to the "substantial transformation" test prescribed in § 12.130(b) under which regulation the country or territory in which merchandise last underwent a "substantial transformation" is regarded as the country of origin.

Under the exception created by the challenged interim regulation, textile products substantially transformed in an insular possession, shipped to a foreign country for assembly or other processing, returned to the insular possession, and then exported to the United States are treated by Customs as a product of the foreign country rather than as a product of the insular possession for purposes of implementing quotas established by the foreign country's textile trade agreement with the United States.

Essentially, then, the primary issue is whether the delegation of authority to the President to administer the United States' textile trade program under § 204 encompasses the authority to issue or to amend rules of origin for textiles and textile products substantially transformed in a United States insular possession and also processed in at least one foreign country or territory.

The resolution of this issue is obviously of critical economic importance to exporters and United States importers of textile and textile products from the United States insular possessions, assemblers and processors of textile products in foreign countries under quota

restrictions imposed by textile trade agreements, United States textile manufacturers that compete in the marketplace with textile exports from United States insular possessions, the governments of the insular possessions having economic interests in attracting textile manufacturing and fostering an export trade to the United States, and of course, Customs which is charged with responsibility for monitoring the entry of goods covered by quotas under the textile trade program. The somewhat parallel legal and financial interests in the issues raised in this case by Target and the government of the U.S. Virgin Islands are evident from the fact that the latter, through its Attorney General, appears in this action in conformance with CIT Rule 76 and an order of this court dated April 14, 1994 as *amicus curiae* in support of Target's challenge to the interim regulation.

Target requests the court to rule: (1) as a matter of law the interim regulation is *ultra vires* and invalid; and (2) therefore, Customs must allow the entry of plaintiff's merchandise under Entry No. 122–4521169–8, dated December 9, 1993, consisting of men's wool suits, notwithstanding the provisions of § 12.130(c)(2), *supra.*

### Background

Procedurally, this action contests the denial of plaintiff's protest to Customs pursuant to 19 U.S.C. §§ 1514(a)(4) and 1515 against the rejection by Customs on December 10, 1993 of plaintiff's Entry No. 122–4521169–8, dated December 9, 1993, covering twelve men's suits made of 100% worsted wool from India cut into suit components in the U.S. Virgin Islands, sewn in the Dominican Republic, shipped to the Virgin Islands for fin-

2. Fundamentally, under the U.S. Constitution the authority to regulate foreign commerce and trade with other nations lies exclusively with the Congress. U.S. Const., Art. I, § 8, cl. 3; Congress may delegate such authority to the Executive. *California Bankers Association v. Schultz,* 416 U.S. 21, 59, 94 S.Ct. 1494, 1516, 39 L.Ed.2d 812 (1974); *Chicago and Southern Airlines v. Waterman S.S. Corp.,* 333 U.S. 103, 109, 68 S.Ct. 431, 435, 92 L.Ed. 568 (1948); *Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933).

Although in this opinion the court refers to the interim regulation as issued by the President, in actuality the Customs Service promulgated the

interim regulation at the request of the Committee for the Implementation of Textile Agreements ("CITA"), which was established by Executive Order 11651 on March 2, 1972 to supervise the implementation of textile trade agreements. Section 2(a) of that Executive Order requires the Commissioner of Customs to take such actions as CITA, through its Chairperson, recommends to carry out agreements entered into by the United States under section 204 of the Agricultural Act of 1956. The Customs Service's notice announcing its promulgation of the interim regulation states that it was issued pursuant to authority granted by the Congress to the President in § 204.

ishing and then exported to the United States. Customs denied entry to plaintiff's goods because plaintiff failed to present with the entry a textile export visa issued by the Dominican Republic, wherein the fabric was sewn, as required by the interim regulation. This interim regulation requires that importers of textile products processed in a foreign country but exported from insular possessions of the United States submit an export visa from the foreign government. Hence, under the interim regulation, the foreign country where the textiles or textile products were merely assembled and sewn prior to importation from an insular possession is regarded as the "country of origin" for quota purposes, notwithstanding that the goods exported to the United States were "substantially transformed" in the insular possession.

Jurisdiction to review denial of protests is predicated on 28 U.S.C. § 1581(a), and accordingly, this action is before the court for *de novo* review. 28 U.S.C. § 2636. Currently *sub judice* are plaintiff's motion for partial summary judgment under CIT Rule 56 on count one of a two count complaint[3] and defendant's response and cross-motion for summary judgment or to dismiss this action in its entirety. The court has reviewed the Statements of Material Facts Not in Dispute filed by the parties and finds there is no genuine issue as to any material fact and the cross-motions raise only a question of law.

On the legal issue presented under count one of the complaint of whether the interim regulation is *ultra vires,* the court holds that the regulation is valid, plaintiff's suits exported from the U.S. Virgin Islands were properly denied entry by Customs because plaintiff failed to submit with its entry an export visa from the Dominican Republic where the suits were assembled, and that as a matter of law defendant is entitled to summary judgment dismissing the action. *See Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560 (Fed.Cir.1987); *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387 (Fed.Cir.1987); *Barmag Barmer Maschinenfabrik AG v.* *Murata Machines,* 731 F.2d 831 (Fed.Cir. 1984).

### Pertinent Statute and Regulations

### Statute:

Section 204 of the Agricultural Act of 1956, as amended, 7 U.S.C. § 1854 (1988) provides:

The President may, whenever he determines such action appropriate, negotiate with representatives of foreign governments in an effort to obtain agreements limiting the export from such countries and the importation into the United States of any * * * textiles or textile products, and the President is authorized to issue regulations governing the entry or withdrawal from warehouse of any such * * * textiles, or textile products to carry out any such agreement. * * *

### Regulations:

19 C.F.R. § 12.130(b) (1993):

(b) *Country of origin.* For the purpose of this section and except as provided in paragraph (c), a textile or textile product, subject to section 204, Agricultural Act of 1956, as amended, imported into the customs territory of the United States, shall be a product of a particular foreign territory or country, or insular possession, of the U.S., if it is wholly the growth, product, or manufacture of that foreign territory, or country, or insular possession. However, except as provided in paragraph (c), a textile or textile product, subject to section 204, which consists of materials produced or derived from, or processed in, more than one foreign territory or country, or insular possession of the U.S., shall be a product of that foreign territory, or country, or insular possession where it last underwent a substantial transformation. A textile product will be considered to have undergone a substantial transformation if it has been transformed by means of substantial manufacturing or processing

---

**3.** Count two of the complaint alleges economic hardship incurred by Target as a result of enforcement of the interim regulation and seeks a permanent injunction against enforcement of the interim regulation by Customs based on invalidity, as alleged in Count one of the complaint.

operations into a new and different article of commerce.

19 C.F.R. § 12.130(c)(2) (1993), the interim regulation at issue:

(c) *Articles exported for processing and returned.*

(2) *Applicability to U.S. insular possession products processed outside the insular possession.* Unless otherwise required by law, the rules of origin applicable to products of the U.S. shall also apply to products of insular possessions of the U.S. Accordingly, notwithstanding paragraph (b) of the section, for purpose of section 204, * * * products of insular possessions of the U.S., if imported into the U.S. after having been advanced in value, improved in condition, or assembled, outside the insular possessions shall not be treated as products of those insular possessions.

### Parties' Contentions

Count one of the two count complaint requests declaratory relief to the effect that the interim regulation is outside the President's authority under § 204, and therefore, as a matter of law is *ultra vires,* and seeks to overturn Customs' exclusion from entry of plaintiff's merchandise exported from the U.S. Virgin Islands because plaintiff failed to submit an export visa from the Dominican Republic. Plaintiff posits, based on a number of inextricably linked grounds addressed below, that § 204 authorizes the President to negotiate and conclude textile trade agreements imposing quotas only with regard to *foreign governments,* whereas the interim regulation imposes quotas on products of insular possessions (which are not foreign countries), thus exceeding the scope of the authority delegated in § 204.

Defendant, on the other hand, emphatically denies that the interim regulation imposes quotas on textile products of the U.S. Virgin Islands and maintains that the interim regulation is within the President's broad authority under § 204 to issue regulations to administer the Government's textile trade program and to "carry out" bilateral textile trade agreements between the United States and foreign countries—in this case the Dominican Republic. Defendant further argues that Target's complaint, in part, sets forth claims that are not justiciable and fail to state a claim upon which relief can be granted.

### The Facts

The relevant facts are straightforward and undisputed.

The U.S. Virgin Islands, purchased from Denmark in 1916,[4] is an insular possession of the United States under the Act of March 3, 1917, ch. 171, 39 Stat. 1132 *et seq.,* codified at 48 U.S.C. §§ 1392 *et seq.* In this case, Target's affiliated exporter in St. Croix, U.S. Virgin Islands cut unmarked fabric, suit lining and interlining materials into garment pieces for men's wool suits, such garment pieces were joined to form components of the garments where appropriate, and then all components and suit parts were shipped to the Dominican Republic for assembly and sewing. Unfinished assembled suits sewn in the Dominican Republic were then returned to the U.S. Virgin Islands, completed and exported to the United States.

On January 20, 1989, the United States and the Dominican Republic entered into a bilateral textile trade agreement limiting the quantities of certain textile products which could be exported to the United States. The Dominican Republic agreed to control exports by the issuance of export visas. The bilateral trade agreement between the United States and the Dominican Republic, among other things, establishes a quota upon the number of men's and boy's wool suits that may be imported into the United States. The availability of such visas is limited because the quantity exported is controlled by the quota for the particular category of goods in question under the trade agreement.

On December 9, 1993 plaintiff, the importer of record or consignee of the subject merchandise, attempted to enter for consumption its wool suits at JFK International Airport by presenting Entry No. 122–4521169–8 and accompanying documents.

---

4. *See Convention on Cession of Danish West Indies,* Aug. 4, 1916, U.S.–Den., T.S. No. 629.

On December 10, 1993 Customs, in compliance with the interim regulation, refused to allow entry of plaintiff's suits on the ground that the suits were advanced in value, improved in condition, or assembled outside the insular possessions—viz., in the Dominican Republic—and plaintiff had failed to present a textile visa from the Dominican Republic, as required by the interim regulation.

Finally, defendant concedes that Customs issued ruling letter CLA–2 CO:R:CV:V 554027 MBH, dated January 13, 1987, long prior to the 1993 interim regulation, which letter concludes that manufacturing operations in the Virgin Islands resulting in "substantial transformation" create products of the U.S. Virgin Islands for purposes of Headnote 3(a) of the Harmonized Tariff Schedule of the United States, and that assembly operations in the Dominican Republic do not constitute a "substantial transformation."

## Discussion

### I.

Section 204, so far as pertinent, authorizes the President to: (1) negotiate agreements with foreign governments limiting the exportation of textiles and textile products to the United States; and (2) promulgate regulations to "carry out" such agreements. Customs, at the recommendation and direction of the Committee for the Implementation of Textile Agreements ("CITA") (which by Executive Order 11651 of March 3, 1972 supervises the implementation of textile agreements), promulgated the interim regulation in dispute. As previously noted, Target vigorously insists that the interim regulation exceeds the authority granted by Congress to the President in § 204 to promulgate regulations implementing textile agreements with foreign governments because the interim regulation imposes quotas on textiles from insular possessions.

■ Fundamentally, of course, the President's exercise of Congressionally delegated authority in matters concerning international trade must be within the scope of the authority granted and comply with procedures prescribed by Congress (if any); conversely, regulatory action taken, ostensibly pursuant to the President's authority under the stat-

ute, but beyond the scope of the delegated authority or in noncompliance with prescribed procedures, is ultra vires and void. See United States v. Schmidt Pritchard & Mangano Cycles Co., 47 CCPA 152, C.A.D. 750, 1960 WL 8527, cert. denied, 364 U.S. 919, 81 S.Ct. 283, 5 L.Ed.2d 259 (1960); United States v. Best Foods, Inc., 47 CCPA 163, C.A.D. 751, 1960 WL 8510 (1960); Luggage & Leather Goods Manufacturers of America, Inc. v. United States, 7 CIT 258, 588 F.Supp. 1413 (1984).

■ Defendant maintains, and the court agrees, that cases relied on by plaintiff involving whether or not the President, in exercising delegated authority under a statute, complied with Congressionally-established procedures and limitations are readily distinguishable and have no bearing on the instant case because, as noted by the Federal Circuit in American Association of Exporters and Importers–Textile and Apparel Group v. United States, 751 F.2d 1239, 1247 (Fed.Cir. 1985) ("American Association"), the law imposes no procedural requirements or limitations upon the President's implementation of the United States' textile program. All that the Government must do is "point to the proper authorizing provision and [show that the action taken was] rationally related to the provision's objective." American Association, 7 CIT 79, 583 F.Supp. 591, 598 (1984), aff'd, 751 F.2d 1219 (1985).

■ The court agrees with defendant that the interim regulation readily satisfies that test and is "relevant to the enforcement of an existing textile agreement," American Association, 751 F.2d at 1247, the United States–Dominican Republic trade agreement. See Mast Industries, Inc. v. Regan, 8 CIT 214, 596 F.Supp. 1567, 1575 (1984) ("Mast I"). The interim rule of origin, an exercise of the broad delegation of authority to the President under § 204 to promulgate regulations to carry out trade agreements, is clearly relevant to the implementation, enforcement and effectiveness of existing textile agreements in achieving their goal of limiting textile imports into the United States. Mast I, 596 F.Supp. at 1575 (limitation of textile imports is the common purpose of § 204, The

Multifiber Arrangement and bilateral textile trade agreements).

Consistent with the treatment of United States textile products sent abroad for further processing and then returned to the United States, *see* 19 C.F.R. § 12.130(c)(1), Customs deemed Target's merchandise to be a textile product of the Dominican Republic in conformance with the provisions of the interim regulation. As aptly pointed out by defendant in support of its argument that the interim regulation is authorized by § 204 because it meets the objective of the statute and Congressional policy of implementing existing trade agreements by precluding circumvention of quantitative restrictions on textile imports: "If section 204 only authorized the issuance of regulations governing imports of textile products which have been last substantially transformed in a foreign country and exported from that country, as Target argues, Pl. Br. 27, soon every insular possession would be used as a platform for importing textiles into the United States in order to evade quantitative restrictions contained in bilateral trade agreements. While that might foster the economic development of the insular possessions, it would obviously blunt 'the common purpose of Section 204, the MFA and the bilaterals ... to limit imports of textiles' into the United States so as to protect the domestic textile industry. *Mast I,* 596 F.Supp. at 1575." Deft.Br. at 20.

■ There is no dispute that plaintiff's goods underwent substantial transformation in the U.S. Virgin Islands prior to the assembly and sewing operations in the Dominican Republic. Plaintiff correctly states that where statutory language in a tariff provision requires a determination of country of origin, it has long been a basic tenet of Customs Law, as judicially and administratively articulated (and now codified in 19 C.F.R. § 12.130(b)), that an imported article's country of origin is the country or place where it last underwent a "substantial transformation," that is, the last location where a new and different article emerged, *see Bellcrest v. United States,* 741 F.2d 1368 (Fed.Cir.1984); *Anheuser–Busch Brew. Assoc. v. United States,* 207 U.S. 556, 562, 28 S.Ct. 204, 206–07, 52 L.Ed. 336 (1908); *Superior Wire v.*

*United States,* 11 CIT 608, 613–14, 669 F.Supp. 472, 477–78 (1987), *aff'd,* 867 F.2d 1409, 1413–14 (1989) and *Ferrostaal Metals Corp. v. United States,* 11 CIT 470, 472–74, 664 F.Supp. 535, 537–38 (1987); *Rules of Origin Applicable to Imported Merchandise,* 59 Fed.Reg. 141, 142 (Jan. 3, 1994); 19 Cust. Bull. 58, 64–65, T.D. 85–38 (proposing rules to add more certainty and uniformity to the substantial transformation test). Indeed, prior to the interim regulation, plaintiff requested and received two Ruling Letters from Customs Headquarters. These rulings concluded that manufacturing operations in the Virgin Islands resulting in a "substantial transformation" create "products of the U.S. Virgin Islands" for purposes of Headnote 3(a) of the Harmonized Tariff Schedule of the United States. Customs also ruled that the partial assembly operations in the Dominican Republic would not constitute "substantial transformation." Customs Service Headquarters Rulings CLA–2 CO:R;CV;V 554027 MBH (January 13, 1987); CLA–2 CO:R:CV:V 554025 MBH (Dec. 16, 1986). Thus, there can be no dispute that prior to the interim regulation, substantial transformation was judicially and administratively a well-embedded test for country of origin determinations.

Unfortunately for plaintiff, the plethora of judicial authority and administrative pronouncements concerning determination of country of origin prior to the interim regulation do not address the precise issue here of the President's authority under § 204 to make an exception in the substantial transformation test for goods processed in one or more foreign countries. In the final analysis, there is no evidence whatever of Congressional intent in § 204 that there may be no exception from the substantial transformation test.

Moreover, the rationale of *Cardinal Glove v. United States,* 4 CIT 41, 43–44, 1982 WL 2243 (1982), involving a determination of country of origin where there is "exportation of merchandise from a country producing a product to an intermediate country for the purpose of processing, manipulating, or assembling that product," (4 CIT at 43–44), heavily relied on by plaintiff, was expressly

rejected as unsound legal authority by the Federal Circuit in applying the country of origin rules promulgated by Customs. *Mast Industries, Inc. v. United States*, 11 CIT 30, 652 F.Supp. 1531, *aff'd*, 822 F.2d 1069, 1073–74 (1987) (*Mast II* ). Indeed, *Mast II* eschews reliance generally upon case law developed before the original rules of origin. *Mast II*, 822 F.2d at 1073–74 ("caselaw is considered the source of the evil the regulation was meant to correct, and thus is something to avoid, not to seek out for guidance").

From the premise that substantial transformation was the judicial and administrative test of choice for country of origin determinations at the time the interim regulation was issued, plaintiff draws the dubious deduction that under § 204 Congress intended the substantial transformation test be an absolutely inviolable criterion for all country or origin determinations regardless of the statutory purpose of the determination, unless *Congress itself* sanctioned an exception, *i.e.*, section 805(d)(1) of the Steel Import Stabilization Act, 19 U.S.C. § 2253 note; Headnote 2, Schedule 8, Part 1, Tariff Schedules of the United States. Implicit in plaintiff's reasoning is that legislative power to make an exception to the substantial transformation test for country of origin purposes is not delegable to the President under § 204 to implement the textile trade agreement program. The court cannot agree.

Defendant's position that the delegation of authority under § 204 is sufficiently broad to empower the President to make the exception in the substantial transformation test set forth in the interim regulation is supported by controlling judicial authority addressing the broad reach of the President's authority under § 204 to implement textile trade agreements.

Thus, in *American Association, supra*, which involved a challenge to the exercise of the President's authority under § 204 in connection with certain import restrictions on Chinese textiles, the Federal Circuit observed regarding the President's authority:

> On the contrary, the beginning of Section 204 says that the President "may, whenever he determines such action appropriate"—*and that preamble covers, not only negotiation with foreign representatives, but also the issuance of regulations "to carry out" the negotiated agreements*. That is a broad grant of authority to the President in the international field in which the *congressional delegations are normally given a broad construction*.

*Id.*, 751 F.2d at 1247 (citations omitted, emphasis added).

Importantly, the court also stated:

> [Section 204] * * * imposes no restrictions on the President's administration of the textile trade program. There are no procedural requirements nor limitations. We find no basis, either within section 204 itself, the overall statutory scheme, or of legislative history, to add more to the statute than meets the eye. *All that is needed is that the President's action be relevant to the enforcement of some existing textile agreement.*

*Id.* (emphasis added). That appears to be the precise situation regarding the interim regulation and the United States–Dominican Trade Agreement.

Other decisions construing § 204 as a broad grant of authority to the President to issue regulations implementing textile trade agreements are: *Yuri Fashions, Inc. v. United States*, 10 CIT 189, 632 F.Supp. 41, *aff'd*, 804 F.2d 1246 (1986) (adopting CIT's opinion), *cert. denied*, 481 U.S. 1004, 107 S.Ct. 1625, 95 L.Ed.2d 199 (1987) (upholding rules of origin, § 12.130(b), pertaining to textile products imported into the United States from insular possessions as opposed to foreign countries); *Mast I*, 596 F.Supp. at 1575 (original country of origin regulations held to be a valid exercise of the President's authority under section 204; Congress' delegation to the President in the foreign affairs arena should be broadly construed, rather than " 'hemmed in or cabined, cribbed, confined by anxious judicial blinders' ").

Defendant additionally stresses that the 1993 interim regulation's country of origin rule was merely an extension of long-standing Executive policy and action in implementing textile trade agreements by country of origin rules *to avoid circumvention of quota restrictions under textile trade agreements.*

Thus, on May 9, 1984 the President directed the Secretary of the Treasury, in consultation with CITA, to issue regulations designed "to prevent circumvention of multilateral and bilateral agreements to which the United States is a party and to facilitate efficient and equitable administration of the United States Textile Import Program." Exec.Order 12,275, 40 Fed.Reg. 16,645 (1984). Among other things, the President directed that, as necessary, such regulations should clarify or revise textile country of origin rules. *Id.*

Soon thereafter, in accordance with policy guidance from CITA, the Secretary of the Treasury issued interim rules of origin for textiles and apparel, 49 Fed.Reg. 31,248 (Aug. 3, 1984), which were finalized in 1985, 50 Fed.Reg. 8,710 (March 5, 1985), and codified at 19 C.F.R. § 12.130. For textiles and textile products produced or manufactured in more than one foreign country, foreign territory, or insular possession of the United States, these rules of origin provided that the textile or textile product at issue should be deemed to be "a product of that foreign territory or country, or insular possession where it last underwent a substantial transformation." 19 C.F.R. 12.130(b). The rules define a "substantial transformation" to mean "transformed by means of substantial manufacturing or processing operations into a new and different article of commerce." *Id.*

However, by the 1993 interim regulation, Customs in a limited departure from its long-time reliance upon the substantial transformation test, following policy guidance provided by CITA, revised in part, the rules of origin for textiles and textile products produced in an insular possession and then subjected to additional processing in a foreign country or territory. 58 Fed.Reg. 19,437 (1993). Instead of continuing to treat a textile product as a product of the foreign country or territory or insular possession where it was last substantially transformed, 19 C.F.R. § 12.130(b), the interim regulation carves out an exception to the substantial transforma-

tion test previously established in the original rules of origin.

According to defendant, supported by an affidavit of July 8, 1994 executed by Rita D. Hayes, Chairman, Committee for the Implementation of Textile Agreements (CITA):

> This change in the rules of origin arose, in part, as a result of a ruling request directed to the Customs Service in August 1991. That request prompted concern that the then current rules of origin appeared to allow "all insular possessions [to] be used as cutting tables for foreign fabric with assembly taking place in a foreign country while still allowing the goods to be considered a product of [an] insular possession and subject to quota." * * *

> The change also resulted from the concern that the then current rules of origin placed United States' textile producers and workers at a competitive disadvantage. * * * Specifically, "if a [United States] producer cut [United States] formed fabric into pieces in New York and shipped the pieces to a foreign country for mere assembly, the finished goods would be a product of that foreign country and subject to that foreign country's quota." * * * Under the then current rules of origin, however, an insular possession producer engaging in the same activities would be able to treat the textiles as products of the United States, not subject to quota, when imported into the United States. * * * Consequently, CITA and the Customs Service changed the rules of origin to address these concerns.

Def't Mem. at 8–9 and attached exh. E.

Consistent with the treatment of United States textile products sent abroad for further processing and then returned to the United States, 19 C.F.R. § 12.130(c)(1),[5] and in compliance with the interim regulation, Customs deemed Target's merchandise sent to the Dominican Republic for assembly and sewing not to be a textile product of the U.S. Virgin Islands, notwithstanding such goods had been substantially transformed there,

---

5. The country of origin rules adopted in 1985 provided that any textile product which is returned to the United States after having been advanced in value or improved in condition abroad may not, upon its return, be considered as a product of the United States. The current rule is at 19 C.F.R. § 12.130(c).

but rather as products of the Dominican Republic for quota purposes.

Judicial authorities cited by plaintiff involving the determination of country of origin under the substantial transformation test, e.g., *Belcrest v. United States,* 741 F.2d 1368 (Fed.Cir.1984) (determination of whether goods were a product of Hong Kong or the Peoples Republic of China for purposes of General Headnote 3(e), TSUS, based on substantial transformation test), are totally inapposite to the precise issue here of Presidential authority to make an exception from such test if deemed appropriate to "carry out" textile trade agreements. Stated otherwise, the issue here is not simply whether the statutory terms "product" or "growth, produce or manufacture" implicate the time-honored substantial transformation test for determining country of origin. Rather, the critical question to be resolved here is whether the scope of the President's authority to issue regulations under § 204 is sufficiently broad to make an exception in the substantial transformation test if deemed appropriate by the President to advance the objectives of the trade agreements program. The court unequivocally responds in the affirmative.

■ By operation of the interim regulation's exception to the substantial transformation test for country of origin purposes, Target's products from the Virgin Islands are treated for quota purposes, not as products of an insular possession, but rather as products of the Dominican Republic. Plaintiff's argument that the interim regulation imposes quotas on textile products of insular possessions is simply a smokescreen for plaintiff's rejected contention that the substantial transformation test is dispositive of a product's country of origin, and such argument also obfuscates the thrust of the interim regulation merely to make an exception in the substantial transformation test for country of origin determinations and *not* impose quotas on products of insular possessions.

■ Plaintiff also objects that the interim regulation ambivalently results in the treatment of plaintiff's suits under the Customs Laws as both "foreign and not foreign." In that vein, plaintiff urges that on the one hand Customs regards plaintiff's suits as "products of" the U.S. Virgin Islands for purposes of preferential duty treatment and marking of country of origin, but on the other hand, as "products ·of" the Dominican Republic for quota purposes.[6] The fallacy of the argument that in Customs Law goods cannot be treated both as "foreign and not foreign," depending upon the purpose of the particular statute under consideration is demonstrated in the case of imports from insular possessions that would have been accorded a duty-free status if based solely on a substantial transformation country of origin test, but yet must be denied duty-free preference granted to United States insular possessions because the goods comprise foreign materials exceeding a prescribed percentage (*viz.,* 50 percent) of the total value of the imported goods, thus subjecting the goods to rates of duty applicable to foreign countries. *See* general note 3(a)(iv) of the Harmonized Tariff Schedules of the United States. *See also Yuri Fashions,* 632 F.Supp. at 47, which suggested that merchandise may be treated in one manner for textile rule of origin purposes (Korean) and another for duty and marking purposes (a product of the CNMI).

■ To buttress their mutual challenge to the interim regulation, Target and *amicus* each seeks to interject into the question of the intent of the statute, Congress' economic and trade policies of the 1980s manifested in the "special status" of the U.S. Virgin Islands by preferential duty status granted under the Harmonized Tariff Schedule of the United States, General Headnote 3(a)(iv), and the Caribbean Basin Economic Recovery Act of 1983, P.L. No. 98–67, § 214. 97 Stat. 369, 392–93, and other indicia of Congressional concern for the economic well-being of the insular possessions that are claimed to mili-

---

**6.** Rules of origin apply in a variety of contexts, a few of which include: (1) the marking of products imported into the United States to disclose the country of origin, 19 U.S.C. § 1304(a); (2) the administration of quota limits, such as those on textiles; (3) the determination of the appro-priate rate of duty; (4) the granting of certain trade preferences under the GSP, 19 U.S.C. §§ 2461–2466, and the Caribbean Basin Initiative, 19 U.S.C. §§ 2701–2706; (5) free trade agreements; and (6) the Buy American Act, 41 U.S.C. § 10a–10d.

tate against any Congressional intent to authorize the 1993 interim regulation.

*Amicus,* for instance, points out that prior to the interim regulation, the original rules of origin provided an important incentive for conducting textile manufacturing operations in the Virgin Islands. Under the original rules, if a textile product had undergone a "substantial transformation" in the U.S. Virgin Islands, the product could be sent to the Dominican Republic or other foreign country for further processing without losing its character as a product of an insular possession for quota purposes. According to *amicus,* the original rule promoted substantial manufacturing operations in the U.S. Virgin Islands and allowed producers to take advantage of lower labor costs in foreign countries in the Caribbean region for assembly and sewing operations, which were in short supply in the U.S. Virgin Islands.

Such economic policy arguments are simply another format for attacking the interim regulation by rehashing the rejected arguments that because the regulation unlawfully excepts substantial transformation as the test for country of origin, such regulation treats insular possessions as foreign countries and imposes quotas on their products. Moreover, plaintiff and *amicus* have failed to point to anything that suggests that preferential duty status granted by Congress, *see* General Note 3(a)(iv) of the HTSUS, was intended to extend to anything other than duty treatment or to any other program. *Yuri Fashions,* 632 F.Supp. at 46 ("nothing in the legislative history of the General Headnote 3(a) [to the Tariff Schedules of the United States] known to the court indicates that the headnote was intended to regulate anything other than rate of duty").

■ Further, it is obvious that the economic concerns and programs of the 1980s dredged up by plaintiff and *amicus* as manifesting a Congressional intent against the interim regulation, were not matters before Congress when it enacted § 204. Plainly, the wisdom of the President's policy choices in issuing the interim regulation in 1993 is not a matter for judicial review in determining whether the interim regulation is *ultra vires. American Association,* 751 F.2d at

1248; *Florsheim Shoe Co. v. United States,* 744 F.2d 787, 795–96 (Fed.Cir.1984) (once it is determined that the President acted within the confines of the authority delegated to him, no further role for courts exists); *United States Cane Sugar Refiners Ass'n v. Block,* 69 CCPA 172, 683 F.2d 399, 404 (1982) ("let the President's action be authorized, and let his action be within the authorizing provisions of the law he cites, and the role of the judiciary is at an end").

## II.

■ Plaintiff maintains that the interim regulation violates the United States' obligations to the Dominican Republic under its bilateral textile trade agreement by charging products exported from the U.S. Virgin Islands against the quantitative limitations applicable to the Dominican Republic under its bilateral agreement, and Congress would not have intended such result under § 204. Citing *United States v. Gue Lim,* 179 U.S. 459, 465 (1900), plaintiff insists that § 204 should not be construed to vest the President with the power to violate United States international obligations to foreign governments by unilaterally reducing the quotas negotiated by the parties under the bilateral trade agreement.

Defendant contends that the issue of whether or not the interim regulation impairs the international obligations of the United States to foreign countries under bilateral textile trade agreements is a nonjusticiable foreign relations issue, and in any event plaintiff has no private right of action to enforce U.S. obligations to the Dominican Republic under the parties' trade agreement.

Plaintiff concedes it has no private right of action against the Government to enforce international obligations owed to the Dominican Republic under its textile trade agreement with the United States, but correctly maintains that it may challenge the interim regulation as *ultra vires* because, *inter alia,* it conflicts with United States obligations under textile trade agreements.

## III.

■ Finally, plaintiff avers that it is entitled to the relief sought because plaintiff

established its U.S. Virgin Islands operations in reliance on the original country of origin regulations and letter rulings mentioned *supra*. However, it is well settled that no one has a vested right to import or in the maintenance of an existing tariff status of the goods. *See Board of Trustees of Univ. of Illinois v. United States,* 289 U.S. 48, 57, 53 S.Ct. 509, 510, 77 L.Ed. 1025 (1933) ("[n]o . . . vested right to carry on foreign commerce with the United States"); *Norwegian Nitrogen Prods. Co. v. United States,* 288 U.S. 294, 318, 53 S.Ct. 350, 359, 77 L.Ed. 796 (1933) ("[n]o one has a legal right to the maintenance of an existing rate of duty"); *Arjay Assoc., Inc. v. Bush,* 891 F.2d 894, 896 (Fed.Cir.1989) (no untouchable right to the continued importation of any product); *North Amer. Foreign Trading Corp. v. United States,* 783 F.2d 1031, 1032 (Fed.Cir.1986) (no vested right to a particular classification or rate of duty or preference).

### Conclusion

For the foregoing reasons, it is hereby ORDERED:

1. Plaintiff's motion for partial summary judgment is denied;

2. Defendant's cross-motion for summary judgment is granted;

3. The action is dismissed.